[No. H006702. Sixth Dist. Feb. 27, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY JOSEPH SPEARS, Defendant and Appellant.

4

**COUNSEL**

Julie Schumer, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson and Deborah D. Factor, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ELIA, J.**—Anthony Joseph Spears appeals from a judgment of conviction entered upon a jury's verdict finding him guilty of the murder and robbery of Dennis Roarke (Pen. Code,[1] §§ 187, 211, 212.5—counts I and II, respectively) and the possession of cocaine (Health & Saf. Code, § 11350, subd. (a)—count III.). The jury also found true allegations that the murder was intentional and was committed during the course of the robbery (§ 190.2, subd. (17)) and that appellant had personally used a firearm during the commission of both offenses (§§ 12022.5, subd. (a), 1203.06).

Following the penalty phase of the trial, the jury returned a verdict of life without possibility of parole. Thereafter, the trial court denied appellant's motion to strike the special circumstance and imposed a sentence of life without possibility of parole on count I; execution of sentence on count II was stayed pursuant to section 654 and imposition of sentence was suspended on count III.

On appeal, appellant assigns as error: (1) the trial court's denial of his motion to suppress evidence pursuant to section 1538.5; (2) the admission into evidence of appellant's statements to the police; (3) the admission into evidence of five autopsy photographs of the victim, Mr. Roarke; and (4) the denial of appellant's motion to strike the special circumstance. For reasons explained below, we affirm.

### STATEMENT OF THE FACTS

*The Prosecution's Case*

On July 5, 1987, at approximately 8:20 a.m., several employees of Chili's restaurant on Stevens Creek Boulevard in Cupertino gathered outside the restaurant in the parking lot after the manager failed to answer the door bell to let them inside for the morning shift. The manager would routinely arrive between 7 and 7:15 a.m; the other employees would begin arriving at about 7:30. Upon their arrival, they would go to the back door of the restaurant and ring the door bell; the manager would then let them in.

Manager Dennis Roarke's car was parked outside the restaurant and although all the doors and windows were locked, the alarm system had been turned off, and the lights inside the restaurant were on. The doorbell had been rung several times, but Roarke did not respond.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Employee Noel Matyas knew about a side door leading into the kitchen that would pop open if kicked just right. When he suggested trying the door, appellant, who was standing around with the other employees, went over and kicked the door open.

Appellant and another employee, Bill Reznor, entered the restaurant followed by Matyas. After discovering Roarke lying on the floor of the manager's office in a pool of blood, appellant said: "Dennis is in the office, he's been shot." Two of the other employees present could not tell that the victim had been shot.

Appellant and employee Bruce Kelly drove to a nearby 7-Eleven to call the police.[2] In the car, appellant seemed upset and shaken and told Kelly he "couldn't believe this happened, . . . it was a tragedy, poor Dennis, who could have done this."

Back at Chili's, appellant and Kelly speculated as to what had occurred. Kelly thought somebody off the street was responsible. Appellant agreed, stating that Mr. Roarke "was the sweetest man in the world and nobody who knew him could have killed him."

When Deputy Donald Staats arrived at Chili's at 8:35 a.m., he spoke to emergency fire personnel who informed him that the person inside the restaurant was dead. He then entered Chili's and saw Roarke lying face down on the floor of his office. When he first observed the body, the deputy could not tell what had happened to the victim.

Deputy Staats separated the Chili's employees who were present and directed them not to speak with each other. After additional officers arrived at the scene, the deputy took statements from several employees, including appellant.

Appellant told Deputy Staats that he was not working that day, but was en route home from a nearby auto parts store when he drove past Chili's and saw some of the employees gathered outside the restaurant. He stopped to find out what was going on. Someone indicated the employees couldn't get into the restaurant and thought the manager must have fallen asleep. They were able to get inside after Noel Matyas suggested kicking open the grill door. Employee Bill Reznor was the first person to see the victim.

Informed of appellant's comment to other employees that the victim had been shot, Deputy Staats inquired why appellant had made that statement.

---

[2] The 7-Eleven manager testified that defendant had bought a doughnut there between 7:30 and 8 that morning. He returned with a companion about 40 minutes later to use the telephone.

Appellant replied: "All that blood, I don't know, it just, I just assumed it looked like he'd been shot." The deputy asked whether appellant had seen any shell casings, traces of gunpowder, bullet holes, or had smelled any gunpowder. Appellant replied that he had not.

Appellant also mentioned seeing a styrofoam cup which was not where it belonged. When he saw the victim, he picked the cup up from a dishwasher and placed it on a shelf south of the manager's office. Appellant appeared calm during the course of the interview and, according to the deputy and other employees who testified, did not appear to be under the influence of alcohol or drugs.

Evidence technician Danny Aulman processed the crime scene, taking photographs and documenting and collecting the evidence. He found a Marlboro cigarette butt on the floor in the dishwashing area and an open Marlboro cigarette pack on the shelf where the styrofoam cup was located. There were two expended .22-caliber shell casings on the floor next to the victim's elbow, a third shell casing under the desk, and another distorted projectile lying next to the phone on the desk. Two Marlboro cigarette butts and an empty Marlboro cigarette pack were located outside the restaurant. A Winston cigarette butt was found inside the dumpster area. There was a large amount of blood on the desk top and floor and blood spatters on a bookshelf and counter.

The office safe was closed but unlocked. Missing from the office was a red log book in which managers noted, among other things, what had occurred during their shift and what needed to be taken care of during the next shift. Also missing were four cash boxes containing between $1,600-$1,750. The computerized register tape indicated that Mr. Roarke had begun his sales report at 7:11 a.m.; the tape stopped running at 7:23 a.m. It was routine procedure for the manager to remain in the office and verify the amount of money in the various cash boxes while the tape was running. David Morgan, another Chili's manager, believed that this procedure was common knowledge amongst the employees.

The coroner's office determined that Mr. Roarke died from gunshot wounds to the head. There were three such wounds, each of which was potentially lethal. One bullet entered the back of Mr. Roarke's head; the other two bullets entered near the victim's left ear. The victim also had a laceration and bruising on his forehead which was consistent with his falling forward and hitting his head on the desk. A second laceration was found on the back of the victim's head. The medical examiner could not determine the direction of Mr. Roarke's head at the time he was shot. Based on the bullet fragments, the coroner concluded that the wounds were inflicted with

a .22-caliber weapon. The wounds were not contact wounds, i.e., where the weapon is held against the victim's head. The most likely scenario was that the victim had been shot from a distance beyond two feet.

Homicide Detectives Gerald Egge and David Pascual arrived at Chili's just before 10 a.m. on July 5, 1987. They conferred with Deputy Staats, who told them what he had learned from his interviews with appellant and the other employees.

After attending the autopsy, the detectives contacted and interviewed the restaurant's janitors, who were then dismissed as suspects. At about 5 p.m. that afternoon they contacted appellant at his home. Although he was not a suspect at this point, Detective Egge thought appellant's statement about the victim having been shot was "unusual" in view of the fact that the detective himself had been unable to determine that the victim had been shot until after he located the expended shell casings on the floor.

Detective Egge interviewed appellant's mother, Mrs. Spears, while Detective Pascual interviewed appellant in a separate location. Mrs. Spears told Egge that appellant left the apartment at approximately 6:30 a.m. that morning. Meanwhile, appellant told Pascual that he left at 8 a.m. to go to an auto parts store near Stevens Creek Boulevard and the Lawrence Expressway.

After five or ten minutes of conversation, the detectives conferred with each other. They then both questioned appellant about his whereabouts that morning. Appellant again stated that he had left home that morning at 8 a.m. to go to the auto parts store. After leaving that location, he stopped at a 7-Eleven, then went to Chili's and returned home.

At some point, the detectives confronted appellant with the discrepancies between his statement and that of his mother's. They also told him that he could not have travelled the described route in the amount of time he stated he was gone from home.

Appellant then stated he had gone to visit his girlfriend, Tina, whom he had been dating for awhile. Appellant was unable to supply Tina's last name or address. The officers asked appellant if he could take them to Tina's house so they could confirm his story and appellant agreed. When appellant got into the patrol car, however, he told the detectives that Tina had moved to the State of Washington that morning. The officers said they would still like appellant to show them her residence and appellant agreed to do so.

Appellant directed the officers to an apartment complex about a mile from Chili's, but was unable to point out Tina's apartment. He then told the

detectives he had never been in Tina's apartment because she was only 16 years old and her parents would not have approved of their relationship. At this point, the officers had been with appellant for about half an hour. Appellant did not seem nervous and was very cooperative, calm and friendly.

When appellant told the detectives that Tina had just completed her sophomore year at Cupertino High School, they asked if he would mind coming down to the sheriff's station to identify Tina from a high school yearbook. Appellant agreed. Although the detectives were somewhat suspicious, they did not consider appellant a suspect at this point.

At the station, as Pascual looked for the yearbook, appellant told Egge that he was lying about Tina being his girlfriend—she was really his cocaine connection. At this juncture, the detectives decided to tape their conversation with appellant in an interview room.[3] The interview commenced at about 8 p.m. and lasted about 75 minutes.[4]

Initially, the officer assured appellant that he would not be prosecuted on drug charges. Thereafter, appellant told the detectives he left his house at about 6:30 a.m. to purchase an "eight ball" (three and one-half grams) of cocaine from Tina. He had received a paycheck for $435 two days earlier and had spent $250 on the buy that morning. He then returned home, went into his bedroom and "did a line." He stayed home for 20 to 30 minutes and then left again a little before 8 a.m. to go to an auto parts shop on Stevens Creek Boulevard, but it was closed. On the way home, he stopped at the 7-Eleven and bought a doughnut. Heading back on Stevens Creek Boulevard, he saw Noel Matyas riding his bike. He also saw several Chili's employees outside the restaurant and decided to stop to see what was going on. The employees told him that Roarke's car was parked outside, but they couldn't get into the restaurant. After Matyas suggested kicking the door, appellant kicked the door open and walked inside. As he turned the corner to the office, he saw Roarke's body lying on the floor in a pool of blood. Appellant came out of the restaurant and told the employees there that Roarke was "down on the floor with blood." However, when one of the officers asked if he remembered telling anyone that the victim had been

---

[3] The taped interview with appellant was played for the jury and admitted into evidence as People's exhibit 40. The trial court had previously considered People's exhibit 40 as well as People's exhibit 3, the written transcript of the interview, at the Evidence Code section 402 hearing on the admissibility of appellant's statement. We requested and received transmission of both exhibits from the superior court pursuant to rule 10(d) of the California Rules of Court. Our summary of appellant's July 5, 1987, statement to Detectives Egge and Pascual is derived from these exhibits.

[4] Appellant contends that the July 5 interview lasted one and one-half hours. However, according to our own estimate, the interview continued for about 75 minutes.

shot, appellant guessed he had made that statement, but could not explain the reason for the remark. He had not seen any bullet holes or wounds, nor did he see a gun, bullets or anything else indicating that the victim had been shot. In response to Detective Pascual's suggestion that the victim might have reminded him of a movie or a dream where someone's been shot, appellant agreed that could have been the reason for his remark. Appellant recalled that he was smoking a Marlboro cigarette when he entered the restaurant. He dropped the cigarette near the back door on his way out.

When he returned home, appellant ingested some more cocaine, but "came down" that afternoon while he was driving over with the police officers. Appellant could not estimate how much money he was spending on cocaine. Although he had received a paycheck for $435 only two days earlier, appellant only had $17 or $18 left. He had spent $250 on the cocaine buy, about $35 on some "weed," $10 on cigarettes, and $17 on gas; he could not account for the remaining money except to suggest that some of it went to sodas and "munchies."

Appellant had owned a .30-caliber M-1 carbine and two .22-caliber rifles, but told the detectives the weapons had been stolen.

When the detectives asked for permission to search his car and bedroom, appellant refused; then stated he would not consent unless first allowed to clean up his room. Detective Egge then asked appellant whether he had shot Roarke; appellant replied that he had not. The detectives stated that it was their belief that the victim, who was doing normal, routine paperwork at the time of the murder, knew his assailant. They suggested that the killer might have needed money for drugs and asked appellant if there was anyone familiar with Chili's who fit that description. Appellant mentioned two cooks as possible suspects.

Appellant had been on vacation from his job at Chili's since the previous Thursday and was not scheduled to return to work for about another week.

After the officers advised him he would not be charged with any drug offenses, appellant provided a blood sample to confirm his drug usage. The sample, obtained at 8:45 p.m., was positive for cocaine and negative for alcohol.

Following the interview, Detective Egge drove appellant home. Appellant was not placed under surveillance, but the following day the detectives obtained a warrant authorizing a search of his person, residence and vehicles.

On July 6, 1987, at approximately 5 p.m., the detectives arrived at appellant's residence to execute the search warrant. When appellant answered the door, Detective Egge advised him of the warrant and showed him a copy. Appellant then told the detectives he would like to straighten up his room first, but the officers refused his request.

The detectives proceeded to appellant's bedroom where the search was commenced. Detective Egge discovered some marijuana and various drug paraphernalia, including a piece of glass, snifters, some grinders, a "bong," and cocaine residue.

Under a wicker couch, Egge found an Ohaus box, commonly used to contain balance beam scales. Inside the box, there were large amounts of bloodstained cash. Upon observing the contents, Egge called out: "It's the money." At that point, appellant fled from the room. Detective Pascual gave chase.

Egge called 911 for assistance and then resumed his search of appellant's bedroom during which he found a large bag with bloodied rolls of coins, a sawed-off .22-caliber rifle with a loaded clip in the magazine and a live round in the chamber, and a usable quantity of cocaine. At that point, the officer stopped the search and called for evidence technicians to respond to the residence and complete the search. The technicians discovered additional money, the stolen cash boxes, a sawed-off rifle stock and .30-caliber ammunition.

Appellant fled to a nearby apartment. When the occupant, Kelly Leureck, opened the front door to go grocery shopping, appellant was standing in the doorway. Frightened, she backed into the apartment; as she did so, appellant walked inside. He told Leureck he wasn't going to hurt her, "but that he had to stay [there] awhile until they left." He then identified "they" as the police. Appellant seemed disoriented, possibly under the influence of drugs. He was very upset and had tears on his face. When Leureck asked him what he had done, appellant said: "[w]hat is the worst thing you can think of?" Leureck then asked if he had killed someone. Appellant bowed his head, shrugged his shoulders and said: "And I'm so sorry." He also told Leureck that he was scared, he had made a mistake and wished the police would just shoot him because he didn't want to be locked up forever. Appellant said that he had hidden the money in his room and the police had found it there.

Leureck's mother, Sandra Lameira, was also in the apartment. At some point, Lameira came up with a plan to get her daughter out of the apartment. She told Leureck that it was time to pick up her little brother at

day-care. After some discussion, during which Leureck promised that she would not tell anyone he was there, appellant allowed Leureck to leave. Once outside, Leureck informed the police of appellant's whereabouts after which they entered the apartment and took him into custody.

Detectives Egge and Pascual escorted appellant to the police station where, after being advised of and waiving his Miranda[5] rights, appellant confessed to Roarke's murder.[6]

Appellant told the officers he needed the money to buy more drugs and to pay off all his bills. He decided to rob Chili's one or two weeks prior to the murder. In preparation, he cut the barrel off a .22-caliber semiautomatic rifle and test-fired the weapon into newspapers and the stock of the gun in his room.

On the morning of the murder, he got up between 6 and 6:30 a.m. and drove straight to Chili's. He took with him the sawed-off rifle and a knife with the intention of robbing and killing the manager, who he knew could otherwise identify him. He did not know which particular manager would be working that morning.

He parked his mother's car in the parking lot of the Night Cap Bar, located next to Chili's, and waited for the manager to arrive. After Roarke arrived and entered the restaurant, appellant rang the bell. When Roarke answered the door, appellant told him he was waiting for some friends and the manager let him inside. The rifle was hidden underneath appellant's jacket. Appellant then got himself some Dr Pepper from the fountain after which he asked Roarke, who was doing some paperwork at his desk, to sell him some quarters. Roarke answered that he would do so as soon as the office safe was open. Appellant loaded the rifle while Roarke, unaware of appellant's activities, continued working at his desk.

Roarke opened the safe and took out the metal cash boxes. He gave appellant the quarters and, in return, appellant paid him. Appellant then hesitated, but decided he had to kill Roarke "cause [he] didn't think [he] could back down." Appellant turned the corner to the office and fired three

---

[5] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[6] The taped interview of appellant's confession was played for the jury and admitted into evidence as People's exhibit 42. The trial court had previously considered People's exhibit 42 as well as People's exhibit 1, the written transcript of the interview, at the Evidence Code section 402 hearing on the admissibility of appellant's confession. We requested and received transmission of both exhibits from the superior court pursuant to rule 10(d) of the California Rules of Court. Our summary of appellant's July 6, 1987, confession is derived from these exhibits.

or four shots. Roarke, who was facing away from appellant at his desk, fell onto the floor. Asked why he fired so many times, appellant stated he "wanted to make sure . . . that [Roarke] couldn't say anything." Appellant collected the cash boxes and the red Chili's ledger and left. He took the ledger because he was afraid Roarke might have noted his purchase of the quarters.

Appellant returned home and hid the stolen items in his room. He then washed his hands, changed his shirt, and returned to Chili's. En route, he stopped at a 7-Eleven and got a doughnut. He went back to Chili's because he realized that his fingerprints were on the cup of Dr Pepper which he had left on the counter. Once he entered the restaurant, he picked the cup up off the counter in order to account for the presence of his fingerprints.

Appellant had not taken any drugs that morning and was not under the influence of drugs or alcohol at the time of the murder/robbery. He had smoked some marijuana the evening of July 4, 1987, and had purchased two grams of cocaine on July 3.

Appellant told the officers he had never been angry with Roarke. At trial, he testified he liked Roarke. However, when he first came up with his plan, two weeks earlier, he decided he would kill whoever was managing Chili's that day. He intended to take the manager by surprise and shoot him in the head because a head wound would most likely be fatal.

After the interview, appellant was taken to Deputy Aulman's office where he was permitted to make a phone call to his mother. Detective Egge and Deputy Aulman were present. Appellant told his mother: "I needed the money. I just made up my mind I was going to do it. Once I got it into my mind, I had to do it. Dennis was a nice guy."

The bullet fragments removed from the victim were compared with test firings from the .22-caliber rifle found in appellant's room. It was determined that the fragments could have been fired from appellant's weapon, but the damaged condition of the fragments precluded a conclusive match. Shell casings found on the floor of the office were compared with shell casings from the test firings and found to have been fired from appellant's rifle. Bloodstains on the money, cash boxes and red ledger found in appellant's room were of the same blood type as that of the victim.

*The Defense*

Appellant admitted killing Mr. Roarke. He devised the plan to rob Chili's within the two-week period preceding the murder/robbery at a time when

he was feeling desperate for money to supply his cocaine habit and to pay the bills he owed; he was overdrawn on his bank account, had a large debt to pay to a collection agency, and "had to get out" of his mother's house. He thought that he would be able to solve all his money problems by stealing the money from Chili's. He sawed off his .22-caliber rifle about a week before the incident and test fired it in his room to make sure that it would work. During this period appellant was using as much cocaine as he could, at times using three and one-half grams in a single episode.

Once inside Chili's on the morning of July 5, appellant asked Roarke if he could buy some quarters for laundry. Roarke said he would have to wait about five minutes until he opened the safe. After purchasing the quarters, appellant loaded the gun. He felt as though he had been "programmed" to commit the crime. Appellant described his feelings at this point: "I stood there for awhile and, . . . [i]t's like something holding me back but also knowing that I had to have this done . . . [b]ecause if I didn't, it would be like my life was over. This was my last chance." Appellant then went to the door of the office and shot Roarke three times. He had no thoughts at that moment, but felt a sense of relief when it was over. He then gathered the cash boxes and the red ledger and left.

When appellant returned to Chili's and saw people's reactions to Roarke's murder, he felt confused about what he had done. To make himself feel better, he called his drug connection and purchased two grams of cocaine. After snorting some of the cocaine, he felt better because it "just took what happened at Chili's out of my mind; I didn't think about it anymore." When he "came down," he started feeling confused again, so he snorted more cocaine in order to avoid thinking about what he had done. Except for the period of time when he was with Detectives Egge and Pascual during the afternoon and early evening of July 5, this pattern continued throughout the evening and the following day.

Appellant could not explain why he made no effort to remove any of the incriminating evidence found during the July 6 search of his room. The crime seemed like a dream: "It was like, . . . a movie, it was like a play, like a game. It wasn't serious." It began to seem real to him when he saw the reactions of the other employees, heard about the murder on television that evening, and when he ran from his room during the search. Although appellant did not deny that his plan included using a gun to shoot the manager, he claimed that he "really didn't go down there and mean to hurt anybody."

Essentially, appellant testified that he was addicted to cocaine and he blamed the underlying crimes upon his addiction. He had been using cocaine for about a year prior to the murder.

## DISCUSSION

1. *Sufficiency of the search warrant affidavit.*

■ Appellant contends the trial court improperly denied his motion to suppress evidence pursuant to section 1538.5, which was premised upon the alleged insufficiency of the search warrant affidavit. We shall uphold the magistrate's finding of probable cause.

In *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317], the United States Supreme Court adopted a totality-of-the-circumstances analysis as the test to be utilized in evaluating the "common-sense, practical question whether there is 'probable cause'" supporting the issuance of a search warrant. (*Id.* at p. 230 [76 L.Ed.2d at p. 543].) In so holding, the court ruled that "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed. [Citation.]" (*Id.* at pp. 238-239 [76 L.Ed.2d at p. 548].)

In its attempt to delineate the parameters of the probable cause standard, *Gates* noted that probable cause, as the term itself implies, deals only with "'the probability, and not a prima facie showing, of criminal activity . . . .' [Citations.]" (462 U.S. at p. 235 [76 L.Ed.2d at p. 546].) The court acknowledged that, under this standard, innocent behavior will often provide the basis for a showing of probable cause, and found this result to be "perfectly reasonable." In this regard, the court found that "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." (*Id.* at p. 244, fn. 13 [76 L.Ed.2d at p. 552].)

*Gates* reiterated the well-settled rule that "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts'. [Citation.] . . ." (462 U.S. at p. 236 [76 L.Ed.2d at p. 547) and also stated that "'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants . . . .' [Citation.]" (*Id.* at p. 237, fn. 10 [76 L.Ed.2d at p. 547].)

■ As the People correctly point out, an officer's law enforcement experience may be considered by the magistrate in determining whether or not the affidavit is sufficient. Inferences or deductions apparent to trained law

enforcement officers may also be considered. (See *In re Tony C.* (1978) 21 Cal.3d 888, 893-894 [148 Cal.Rptr. 366, 582 P.2d 957]; *United States* v. *Fouche* (9th Cir. 1985) 776 F.2d 1398, 1403 [80 A.L.R.Fed. 605].)

 In the instant case, the search warrant was issued on the basis of an affidavit authored by Detective Egge, an experienced officer currently assigned to the homicide unit, which stated the details of the criminal investigation of Mr. Roarke's murder in substantially the same manner as is recounted in our statement of facts. As the appellant notes, the affidavit included everything known about the case through the July 5, 1987, interview of appellant. In addition, the affidavit included (1) Egge's conclusion, based on the fact that there were no signs of forced entry, that the assailant was known to the victim, and (2) the discovery of Marlboro cigarette butts in an alcove near the manager's office coupled with the detective's assertion that appellant smoked Marlboro cigarettes during the July 5 interview.

Based on these facts, we are satisfied that there was a substantial basis supporting the magistrate's finding of probable cause. (See *Illinois* v. *Gates, supra,* 462 U.S. at pp. 238-239 [76 L.Ed.2d at pp. 548-549].) As the People correctly note, the affidavit established appellant's proximity to Chili's at 8:30 a.m. on his day off. It also established that appellant could have been at the murder scene at the time of the victim's death: he left home that morning at around 7 a.m.; the victim died sometime between 7:11 and 8:40 a.m. Lack of signs of forced entry coupled with the fact that the decedent was handling large amounts of cash at the time of the murder supported the affiant's opinion that the killer was someone known to the victim. Even though the cause of death was not readily apparent, appellant exclaimed that the victim had been shot. He could give no credible explanation for this statement. The appellant gave conflicting statements about his whereabouts and activities on the morning of the murder. During the July 5 interview, appellant smoked Marlboro cigarettes; Marlboro cigarette butts were discovered in an alcove near the manager's office. In addition, appellant's interview established that he was spending significant amounts of money on cocaine.

Appellant does not challenge the veracity or reliability of the contents of the affidavit, but contends that all of the facts stated therein constitute "at best only a suspicion of appellant's involvement in the death of Mr. Roarke." We disagree.

 As noted above, a finding of probable cause requires only a " 'probability, and not a prima facie showing, of criminal activity . . . .' [Citations.]" (*Illinois* v. *Gates, supra,* 462 U.S. at p. 235 [76 L.Ed.2d at p. 546].) Moreover, the fact that particular conduct may be innocent is not the

relevant inquiry. Rather, we must look to "the degree of suspicion that attaches to particular types of noncriminal acts." (*Id.* at p. 244, fn. 13 [76 L.Ed.2d at p. 552].)

Although there may very well have been innocent explanations for the various facts contained in the affidavit, we believe that all of the factors, considered in their totality, supplied a degree of suspicion sufficient to support the magistrate's finding of probable cause. Based on the "common-sense, practical" approach mandated by our high court in *Gates*, we hold there was a substantial basis for the magistrate's conclusion that probable cause existed. (See 462 U.S. at pp. 238-239 [76 L.Ed.2d at pp. 548-549].)

2. *Good faith reliance on the magistrate's probable cause determination.*

■ Assuming arguendo that the affidavit was deficient, we hold that the good faith exception enunciated in *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405] is applicable in the instant case.

In *Leon* the Supreme Court held that the exclusionary rule should not be applied when an officer conducting a search reasonably relies on a warrant issued by a detached and neutral magistrate which is subsequently determined to be invalid. (468 U.S. at p. 913 [82 L.Ed.2d at p. 692].)

Appellant correctly points out that suppression remains an appropriate remedy in certain circumstances, as where the warrant is based on an affidavit " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' [Citation.]" (468 U.S. at p. 923 [82 L.Ed.2d at p. 699].) In most cases, the fact that a warrant was issued by a neutral and detached magistrate will suffice to establish that the officer has acted in good faith in conducting the search. However, the officer's reliance "on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable." (*Id.* at p. 922 [82 L.Ed.2d at p. 698].) The objective standard adopted by *Leon* "requires officers to have a reasonable knowledge of what the law prohibits." (*Id.* at p. 920, fn. 20 [82 L.Ed.2d at p. 696].)

The good faith inquiry is confined to the question of whether a "reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." (468 U.S. at p. 922, fn. 23 [82 L.Ed.2d at p. 698].) Where the affidavit is sufficient to create disagreement among thoughtful and competent judges, the officer's reliance on the magistrate's determination of probable cause should be deemed objectively

reasonable. (*Id.* at p. 926 [82 L.Ed.2d at pp. 700-701]; accord *U.S.* v. *Hove* (9th Cir. 1988) 848 F.2d 137, 139.)

■ Appellant contends that no reasonably well-trained officer could have relied upon the legality of the warrant in this case since the supporting affidavit was bereft of probable cause. We reject this contention.

We agree with the People that the affidavit in the instant case clearly specified the reasons for suspecting appellant's involvement in the victim's murder and why the items stolen in the robbery/murder might be recovered at appellant's home. As noted above (see pt. 1), the information in the affidavit, obtained by the affiant himself in his role as one of the investigating officers, set forth facts which suggested motive (the need for money to supply a cocaine habit), opportunity (the hour of appellant's departure from home established that appellant could have been at the crime scene at the time of the murder), and consciousness of guilt, as reflected by the various conflicting statements which appellant made. Other factors, such as the discovery of appellant's brand of cigarettes at the crime scene, appellant's spontaneous statement about the cause of the victim's death, and appellant's presence at Chili's during vacation, lent credence to the affiant's suspicions concerning appellant's involvement in the crimes.

Based on these facts, we have no hesitation in determining that the police search was conducted in good faith reliance upon judicial authorization thereof. Thus, even if we assume for purposes of argument, that the affidavit was insufficient, suppression would not be required given the officers' objectively reasonable reliance on the magistrate's determination of probable cause. (*United States* v. *Leon, supra,* 468 U.S. 897.)

3. *Whether appellant's statements were properly admitted into evidence.*

At trial, appellant moved to suppress his July 5 and July 6, 1987, statements to Detectives Egge and Pascual claiming that (1) the first statement was obtained in violation of his *Miranda* rights, and (2) the second statement was involuntary because it was induced by promises of leniency. After an Evidence Code section 402 hearing, the trial court denied the motion. The court found that appellant had not been subjected to custodial interrogation during the first interview, thus obviating the requirement for any *Miranda* warnings. The superior court then held that appellant's July 6 statement was not obtained by improper police conduct. Appellant challenges both rulings on appeal and claims that the introduction of the statements constituted prejudicial error.

In reviewing appellant's constitutional claims we must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. (*People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610].) We must then independently determine from the undisputed facts, and those properly resolved by the superior court, whether the contested statements were obtained unlawfully. (*Ibid.*) Applying these principles, we find appellant's *Miranda* and Fifth Amendment claims unpersuasive.

A. *Evidence material to the Evidence Code section 402 hearing.*

When Detectives Egge and Pascual arrived at appellant's apartment on July 5, 1987, they were dressed in street clothes and did not have their weapons exposed. Appellant was not a suspect at that time, but the officers wanted to question him because he was at the scene when the murder was discovered and because of his statement that the victim had been shot.

Initially, the officers separated appellant from his mother and took separate statements in accord with standard police procedure. Detective Pascual questioned appellant for a brief interval about his whereabouts that morning, during which time appellant was free to leave. When the detectives conferred, they discovered discrepancies between appellant's statement and that of his mother. When questioning resumed, with both officers present, appellant was asked to describe the route he had taken that morning. After he did so, the officers told appellant they did not believe he could have taken the described route of travel and arrived at Chili's by 8:30 a.m. Appellant then changed his story and told the detectives he had visited a girlfriend by the name of Tina, but could not supply her last name or address. The officers asked appellant if he could show them where Tina lived and appellant assented. He then directed the officers to an area near Stevens Creek Boulevard and Richfield (the Richfield location) and told the officers he had met Tina there because she was only a 16-year-old sophomore at Cupertino High School and her parents did not approve of their relationship. At that point, the officers asked appellant if he would come down to the police station where he could look through the high school yearbooks and identify Tina. Appellant agreed. Detective Pascual testified that if appellant had asked to go home at that point, he would have been allowed to do so.

Upon their arrival at the police station, appellant and Egge went upstairs to an interview room. While Pascual was out of the room, appellant told Egge that he had really gone to the Richfield location that morning to buy cocaine from Tina.

Detective Pascual testified that up to this point, appellant was still not a suspect. Rather, the officers were attempting to exclude him by obtaining

confirmation of his whereabouts that morning. At this time, the detectives decided to tape-record their interview with appellant. The interview session lasted about an hour and 15 minutes.

At one point during the interview, the officers asked appellant whether he had killed Mr. Roarke; appellant answered that he had not. When the detectives asked for permission to search his room, appellant refused.

At the conclusion of the interview, the officers asked appellant to submit to a blood test to confirm his drug usage and appellant consented. Thereafter, Egge returned appellant to his residence. They left the police station between 7:30 and 8:30 p.m. that evening.

According to the officers, appellant was at all times free to leave, and was told so on several occasions during the time he spent with the detectives; appellant never asked to go home. The officers also asserted that appellant was never restrained, threatened or intimidated in any way, nor was appellant placed under surveillance following the interview. The officers further testified that appellant was never told that he was a suspect during the course of the questioning which occurred on July 5. In fact, it was only after the detectives conferred that evening by telephone, during which time they were able to compare notes, that they focused on appellant as a suspect and decided to seek a search warrant for appellant's residence.

When the officers executed the search warrant the following day, they seized evidence implicating appellant in Roarke's murder. Appellant was arrested and transported to the police station. The July 6 interview, during which appellant confessed to the murder/robbery, commenced about an hour after the arrest. After Detective Egge advised appellant of his *Miranda* rights, the following colloquy occurred:

"EGGE: Okay. With everything that's gone on today, I think it's about time you got this off your chest. Do you want to talk to us about now, tonight? I think it's about time that we got the scoop here that you'll be better (inaudible).[7]

"SPEARS: You want to start.

"EGGE: Okay.

"SPEARS: I guess I'll answer what I can.

---

[7] When asked at the Evidence Code section 402 hearing what he said during the inaudible portion of the tape, Detective Egge testified that he could not recall. At the preliminary hearing, he testified he had said: "I think you'll be better off too."

"EGGE: Well alright.

"PASQUALE: Can you talk to us about it?

"EGGE: I think it would behoove you to talk to us about it. Don't you Tony? I think it's about time you get it off your chest and everything that happened today? It's kind of obvious. Why don't you just tell us what you've got on your mind?

"SPEARS: I don't (inaudible) I mean, it's like this, this didn't seem real until, until I ran. I don't know, I don't know why."

B. *Whether appellant was subjected to custodial interrogation during the July 5 interview.*

■ "*Miranda* applies to questioning under the coercive conditions of official 'custody.' [Citation.] 'Custody' means' a "formal arrest or restraint of freedom of movement" of the degree associated with a formal arrest.' [Citations.]" (*People* v. *Boyer, supra,* 48 Cal.3d at p. 271; citing *California* v. *Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279-1280, 103 S.Ct. 3517].) "Where no formal arrest takes place, the relevant inquiry, as with Fourth Amendment claims, 'is how a reasonable [person] in the suspect's position would have understood his situation. [fn. omitted.] . . .' [Citations.]" (48 Cal.3d at p. 272; citing *Berkemer* v. *McCarty* (1984) 468 U.S. 420, 442 [82 L.Ed.2d 317, 446, 104 S.Ct. 3138].) ■ "In deciding the custody issue, the totality of circumstances is relevant, and no one factor is dispositive. [Citation.] However, the most important considerations include (1) the site of the interrogation, (2) whether the investigation has focused on the subject, (3) whether the objective indicia of arrest are present, and (4) the length and form of questioning. [Citations.]" (48 Cal.3d at p. 272.) ■ *Miranda* warnings are not required simply because the questioning takes place at a police station. This is so even if the subject questioned is a suspect. (*California* v. *Beheler, supra,* 463 U.S. at p. 1125 [77 L.Ed.2d at pp. 1279-1280]; *Oregon* v. *Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711].)

■ In arguing that the July 5 interview constituted custodial interrogation for *Miranda* purposes, appellant cites the following factors: (1) the site of the questioning, i.e., an interview room at the sheriff's station; (2) the accusatory nature of the questioning, as evidenced by Detective Egge's inquiry whether appellant had shot Roarke and extensive questioning concerning appellant's drug use and activities; (3) the fact that the officers did not advise appellant of his right to refuse further questioning and/or leave

at any point close in time to the interview;[8] and (4) the length of the interview as well as the additional two or more hours appellant spent in the company of the officers prior to being taken to the sheriff's station.[9]

In *California* v. *Beheler* and *Oregon* v. *Mathiason,* the Supreme Court considered whether the defendants had been subjected to interviews which were custodial in nature, thus triggering the requirement for *Miranda* warnings. In both cases, the defendants were asked to come to the police station for questioning. Once there, each defendant was specifically told that he was not under arrest, although Mathiason, a parolee, was informed that he was a suspect. The police officer falsely told Mathiason that his fingerprints had been found at the scene of the crime. Mathiason confessed within five minutes of his arrival, after which the officer advised him of his *Miranda* rights, interviewed him for another twenty-five minutes, and then released him. Beheler was interviewed for about 30 minutes and then allowed to leave.

The Supreme Court held that neither *Beheler* nor *Mathiason* had been subjected to custodial interrogation and ruled that the failure to provide *Miranda* warnings before commencement of questioning did not render their statements inadmissible. (*California* v. *Beheler, supra,* 463 U.S. at pp. 1124-1125 [77 L.Ed.2d at pp. 1278-1280]; *Oregon* v. *Mathiason, supra,* 429 U.S. at pp. 495-496 [50 L.Ed.2d at pp. 714-715].)

Our own Supreme Court's decision in *Green* v. *Superior Court* (1985) 40 Cal.3d 126 [219 Cal.Rptr. 186, 707 P.2d 248], is also instructive. In that case, police officers first contacted the defendant at 4:15 p.m. They took him to the police station for an interview, which commenced at 4:35 p.m. and continued until 5:30 p.m. At that point, the officers told defendant they wanted to tape-record his statement, instructed him to " 'mentally review the time frames,' " and then left him in the interview room while they gathered the recording equipment. The officers resumed questioning from 5:50 p.m. to 6:35 p.m. at which time they told defendant they were late for a meeting. They asked him to wait for them because they might have some additional questions. The defendant agreed and the officers again left him in the locked interview room for an additional 25 minutes, at which time a request to examine defendant's coveralls was conveyed to the defendant. Defendant agreed to the examination, which revealed traces of blood. At this point, the defendant, who remained secluded in the locked interview

---

[8] Appellant correctly asserts that there is no such advisement on the tape itself. The testimony of the officers in this regard was that they had admonished appellant of his right to terminate the questioning several times, if not at the sheriff's station, then en route.

[9] As noted previously, our own estimate of the length of the taped interview is about 75 minutes.

room, became a suspect in the victim's murder. About the same time the coveralls were being examined, police technicians discovered additional evidence implicating defendant in the murder. The officers finally returned to the interview room at 10:15 p.m., at which time they gave defendant *Miranda* warnings. (*Id.* at pp. 131-133.)

Despite the lengthy period of questioning, the total amount of time Green spent at the police station, the fact that Green was never expressly told that he was not under arrest, and the detailed nature of the questions, which included inquiries about Green's personal life, among other things, the *Green* court upheld the trial court's conclusion that the interrogation was not custodial in nature. Among the factors which the court emphasized were the nonaccusatory tone of the questioning and the fact that the officer advised defendant, when he was first asked to come to the station for an interview, that he could leave at any time. (See 40 Cal.3d at pp. 131-135.)

Appellant attempts to distinguish the present case from *Beheler* and *Mathiason*, citing his limited experience with the police, the officers' failure to advise him of the right to leave at a point close in time to the interview, and the prolonged period of questioning coupled with the lengthy period during which appellant was in the company of the police (commencing around 5 p.m.). Although there may be dissimilarities between the instant case and the Supreme Court decisions, we do not find them to be crucial. Based on the totality of the circumstances, we believe the trial court's decision should be upheld.

Although the taped interview did take place at the station house, that factor, as noted above, has repeatedly been held, in and of itself, to be insufficient to establish custodial interrogation. (*California* v. *Beheler, supra*, 463 U.S. at p. 1125 [77 L.Ed.2d at pp. 1279-1280]; *Oregon* v. *Mathiason, supra*, 429 U.S. at p. 495 [50 L.Ed.2d at p. 714]; *People* v. *Boyer, supra*, 48 Cal.3d at p. 272; *Green* v. *Superior Court, supra*, 40 Cal.3d at pp. 133-136.)

We agree that the questioning of appellant was extensive in nature and included many inquiries concerning his drug use and money habits, as well as one pointed question regarding his complicity in the crime. Nevertheless, we do not find the length or form of the questioning was such that a reasonable person would have believed that his freedom of movement had been impaired in any significant way. The tone of the officers throughout the interview was courteous and polite. At no time did the officers attempt to threaten or intimidate appellant (compare *People* v. *Celaya* (1987) 191 Cal.App.3d 665, 669 [236 Cal.Rptr. 489]), nor did they lead him to believe that he was a suspect in the murder, that they considered him to be guilty, or that they had the evidence to prove his guilt in court. (Compare *People* v.

*Boyer, supra*, 48 Cal.3d at p. 272.) In sum, although the questions were detailed, they were not accusatory in nature. (See *Green* v. *Superior Court, supra*, 40 Cal.3d at pp. 132, 135-136.)

Neither do we believe that the interrogation, which according to our estimate, continued for approximately 75 minutes, was unduly prolonged. Although appellant was interviewed for a lengthier period than were the defendants in *Beheler* and *Mathiason*, the period of interrogation was shorter than that which occurred in *Green*. Nor do we find the aggregate period of time which appellant spent in the officers' company a compelling factor. In *Green*, for example, the defendant had been with the police for some two and one-half hours, under circumstances which we believe are much more susceptible to a finding of custodial interrogation, when he consented to a search of his coveralls. (*Green* v. *Superior Court, supra*, 40 Cal.3d at pp. 131-135.) Here, appellant was informed several times that he was free to leave. Much of the questioning occurred outside of the police station and that portion of the interview which was conducted at the station house was not unduly prolonged, nor was there anything inherently coercive about the interview itself or the overall questioning.

Moreover, although it is unclear exactly when the police officers advised appellant of his right to leave and while no such admonishment appears on the tape-recorded interview, the record establishes that the detectives did advise appellant several times during the course of the evening that he was, in fact, free to leave. In this regard, it is significant to note that towards the end of the interview, appellant refused Egge's request for permission to search his room and automobile. In our view, appellant's assertion of his Fourth Amendment rights at this particular juncture is strong evidence that he believed his freedom of choice, including freedom to leave, had not been restricted. Also supporting the trial court's conclusion that appellant was not subjected to custodial interrogation is the fact that appellant was allowed to return home, without hindrance, at the close of the interview. (Cf. *Oregon* v. *Mathiason, supra*, 429 U.S. at p. 495 [50 L.Ed.2d at p. 714].)

As noted above, however, no one factor is dispositive of the custody issue, rather we must look to the totality of the circumstances. (*People* v. *Boyer, supra*, 48 Cal.3d at p. 272.) In the instant case, examination of the relevant factors leads us to conclude that the record supports the trial court's finding that appellant was not in custody or otherwise deprived of his freedom of action in any significant way. Accordingly, we hold that the July 5 interview was properly admitted into evidence.

C. *Whether appellant's July 6 confession was induced by improper police conduct.*

Before a confession or admission may be used against a defendant, the People must prove by a preponderance of the evidence that such statements were voluntary. (*People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042]; *Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 92 S.Ct. 619].) A confession is considered voluntary if it is "the product of a rational intellect and a free will." (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 80 S.Ct. 274].) In general, voluntariness is established " 'if the accused's decision to speak is entirely "self-motivated" [citation], i.e., if he freely and voluntarily chooses to speak without "any form of compulsion or promise of reward . . . ." [Citation.]' " (*People* v. *Boyde* (1988) 46 Cal.3d 212, 238 [250 Cal.Rptr. 83, 758 P.2d 25], citing *People* v. *Thompson* (1980) 27 Cal.3d 303, 327-328 [165 Cal.Rptr. 289, 611 P.2d 883].) If, however, the confession was elicited by any promise of leniency or advantage, express or implied, the confession is deemed involuntary and inadmissible as a matter of law. (46 Cal.3d at p. 238.

However, "mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or promise does not render a subsequent confession involuntary. [Citations.]" (*People* v. *Jiminez* (1978) 21 Cal.3d 595, 611 [147 Cal.Rptr. 172, 580 P.2d 672].) The distinction between permissible police conduct and improper coercion does not depend on the language of the inducement, but rather upon the nature of the benefit to be derived. "Thus, '[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, 'if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible . . . .' [Citations.]" (*Id.* at pp. 611-612.)

Appellant cites Detective Egge's suggestions that it was "time [he] got this off [his] chest," and that appellant would be better off once he gave them "the scoop" as implied promises of benefit, beyond the mere psychological relief that would flow from telling the truth, which promises rendered appellant's confession involuntary. In so arguing, appellant cites his youth (19½ years of age), a substantial cocaine problem which was known to the officers, his minimal prior experience with the police, and appellant's

emotionally distraught state, as considerations which this court must take into account in determining whether, under the totality of the circumstances, the confession was voluntary.

We do not disagree that these are all valid factors which must be taken into account. (See *Stein* v. *New York* (1953) 346 U.S. 156, 185-186 [97 L.Ed. 1522, 73 S.Ct. 1077].) Nevertheless, we cannot agree that the officer's suggestions amounted to anything more than the benefit which would naturally flow from pursuing a truthful and honest course of conduct. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 299 [168 Cal.Rptr. 603, 618 P.2d 149] [officer's statement that defendant "would feel better" if he confessed did not constitute improper inducement]; *People* v. *Hill* (1967) 66 Cal.2d 536, 548-549 [58 Cal.Rptr. 340, 426 P.2d 908] [no improper police inducement where officer urged defendant to "help himself"].) Accordingly, we conclude that the officer's statements conveyed no improper inducements, express or implied, which would render appellant's confession involuntary.

4. *Whether autopsy photographs of the victim were properly admitted.*

Next, appellant contends the court abused its discretion in admitting into evidence, over appellant's Evidence Code section 352 objection, five autopsy photos of the victim, Mr. Roarke.[10] It is argued that the court's error requires reversal of the special circumstance finding. In the trial court, appellant argued that the photos were more prejudicial than probative especially since he would not dispute that the victim "suffered wounds in the manners described and depicted in those photographs." Appellant also asserted that the photos would be cumulative of the autopsy physician's testimony. The People countered that the photos were relevant on two grounds: (1) to corroborate the autopsy physician's testimony; and (2) to establish intent to kill. The trial court overruled appellant's objection on the grounds stated by the People, having determined that although the photographs were not "pleasant," neither were they "inherently grotesque." We find no abuse of discretion in the trial court's decision to admit the photographic evidence.

" ' "The admission of photographs of victims lies primarily within the discretion of the trial judge who determines whether their probative value is outweighed by their prejudicial effect." ' " (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1255-1256 [232 Cal.Rptr. 849, 729 P.2d 115], quoting *People* v. *Fields* (1983) 35 Cal.3d 329, 372 [197 Cal.Rptr. 803, 673 P.2d 680].) " '[A] trial court's refusal to exclude otherwise admissible photographs under [Evi-

---

[10]We requested and received transmission of People's exhibits 1A, 1B, 1C, 1D, and 1E from the superior court pursuant to rule 10(d) of the California Rules of Court.

dence Code] section 352 will not be disturbed on appeal unless the prejudicial effect clearly outweighs the photos' probative value. [Citations.]' " (42 Cal.3d at p. 1256, quoting *People* v. *Ramos* (1982) 30 Cal.3d 553, 576-577 [180 Cal.Rptr. 266, 639 P.2d 908]; reversed on other grounds in *California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].)

Appellant concedes that the reasons stated for the trial court's ruling have been recognized as a standard rationale for the admission of photographs of homicide victims. As the court noted in *People* v. *Willis* (1980) 104 Cal.App.3d 433, 451 [163 Cal.Rptr. 718, 9 A.L.R.4th 578], "[s]uch photos are often admitted as relevant evidence for the purpose of clarifying medical testimony [citation], or for the assistance provided in establishing elements of the crime [citation], including the existence of malice, premeditation or the negation of some asserted defense [citation]."

Indeed the photos here were clearly relevant to corroborate and illustrate the testimony of the autopsy surgeon, Dr. Pakdaman, regarding the nature and extent of the wounds and to establish the existence of malice. (Cf. *ibid.*; *People* v. *Allen, supra,* 42 Cal.3d at p. 1256; *People* v. *Williamson* (1985) 172 Cal.App.3d 737, 747 [218 Cal.Rptr. 550].)

Nor was the photographic evidence unduly prejudicial. As the trial court correctly discerned, the photographs, though unpleasant, were not excessively gruesome and were relevant to the issues. As has often been said, " ' "murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant . . . ." ' " (*People* v. *Williamson, supra,* 172 Cal.App.3d at p. 747, quoting *People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].)

Appellant contends that the photographic evidence, even if relevant, was cumulative and therefore should have been excluded. Even if we assume, for purposes of argument, that the court abused its discretion in admitting the photographs into evidence, any error was plainly harmless.

The People correctly argue that there was overwhelming evidence of appellant's intent to kill. He admitted, both in his confession and on the witness stand, that he sawed off the barrel of the murder weapon in order to make it less conspicuous. According to his own testimony, he test fired the weapon at home to make sure that it would work. He went to the restaurant with the express intent of killing whoever was managing that morning so that he could not later be identified. Moreover, he planned to shoot the victim in the head as that would most likely ensure a fatal wound. He loaded the weapon after he entered the restaurant and shot the victim in the head, not once but three times.

Following his arrest, he told his mother he "needed the money. I just made up my mind I was going to do it. Once I got it into my mind, I had to do it."

In view of the overwhelming evidence of appellant's intent to kill, we hold that it is not reasonably probable the jury would have reached a different result had the photographs been excluded. (Cf. *People* v. *Allen, supra,* 42 Cal.3d at pp. 1255-1258.)

5. *Whether the trial court abused its discretion in refusing to strike the special circumstance.*

■■■ Appellant contends the trial court abused its discretion by failing to strike the special circumstance finding pursuant to its authority under section 1385. In support of his argument, appellant cites various factors, including: (1) his youth; (2) his lack of prior felony convictions; (3) his minimal criminal record, which consisted of two nonviolent misdemeanor convictions; (4) his employment history; (5) his cocaine use, which it is argued impaired his capacity to appreciate the criminality of his acts and to conform his conduct to the law; (6) the fact that he was raised in a dysfunctional family unit with an alcoholic and abusive father; and (7) his remorse for the underlying crimes. We conclude that the trial court acted well within its discretion in denying appellant's motion.

Trial courts should exercise their discretion to strike special circumstance findings "in a careful and thoughtful manner. The wise use of this power will promote the administration of justice by ensuring that persons are sentenced based on the particular facts of the offense and all the circumstances. It enables the punishment to fit the crime as well as the perpetrator." (*People* v. *Williams* (1981) 30 Cal.3d 470, 489 [179 Cal.Rptr. 443, 637 P.2d 1029].) In assessing the propriety of such a motion, trial courts should also consider "factors personal to the defendant, such as attributes of character and prior record." (*People* v. *Warren* (1986) 179 Cal.App.3d 676, 690 [224 Cal.Rptr. 746].)

Appellant attempts to analogize the present case to *People* v. *Harpool* (1984) 155 Cal.App.3d 877 [202 Cal.Rptr. 467], where the trial court struck the special circumstance findings. *Harpool* involved the robbery of a market during which the defendant shot the victim after she activated an alarm. Thereafter, the defendant attempted to flee the state. Once apprehended, he denied any involvement in the murder and presented an alibi defense at trial. (*Id.* at pp. 882-883.) The defendant was young, had no felony record, and was suffering from serious psychological problems. (*Id.* at pp. 889-890.)

Although some of the factors present in *Harpool* are applicable in the instant case, particularly the appellant's youth, minimal criminal record, and apparent drug and psychological problems, there are critical distinctions in the case at bench. Chief among them is the cold-blooded nature of the murder. In *Harpool*, there was little, if any, evidence of premeditation and deliberation. In the instant case, however, appellant planned the murder well in advance and took all the necessary steps to carry out his ill conceived plan, including preparing and test-firing the murder weapon.

Although appellant stated that he liked the victim and had nothing personal against him, he nevertheless carried out his plan to murder the manager on duty so that he could not later be identified. We agree with the People that the overwhelming evidence of premeditation and deliberation coupled with the cold and calculating manner in which the crime was carried out distinguishes the present crime from that which occurred in *Harpool*. Moreover, it was precisely because of the cold-blooded nature of the killing and the extensive planning therefor that the trial court here denied the motion to strike. We have no reservations in holding that the trial court acted well within its sound discretion in denying appellant's motion.[11]

*Disposition*

The judgment is affirmed.

Capaccioli, Acting P. J., and Bamattre-Manoukian, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 16, 1991.

---

[11] In view of our decision, we need not consider whether the Crime Victim Justice Reform Act, otherwise known as Proposition 115, effective June 6, 1990, which removes from the trial court the power to strike or dismiss any special circumstance, should be applied retroactively to the instant case.