Filed 4/27/22  P. v. Flores CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARTIN FLORES,<br><br>    Defendant and Appellant. | D078725<br><br><br>(Super. Ct. No. RIF1705049) |

APPEAL from a judgment of the Superior Court of Riverside County, Jeffrey M. Zimel, Judge.  Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A second amended information filed in October 2020 charged defendant Martin Flores with the following crimes against granddaughters Jane Doe 1 and Jane Doe 2:  aggravated sexual assault by rape of a child under 14 years

of age and seven or more years younger than the defendant (Pen. Code, §§ 261, subd. (a)(2), (6), 269, subd. (a)(1)–counts 1 & 6);[1] forcible rape of a child under 14 years of age (§§ 261, subd. (a)(2), 264, subd. (c)(1)–counts 2 & 7); aggravated sexual assault by oral copulation of a child under 14 years of age and seven or more years younger than the defendant (§ 269, subd. (a)(4)–counts 3 & 8); forcible oral copulation of a child under 14 years of age (former[2] § 288a, subd. (c)(2)(B)–counts 4 & 9); and forcible lewd acts upon a child under the age of 14 (§ 288, subd. (b)(1)–counts 5, 10 & 11).

The second amended information further alleged that Flores kidnapped the victim in count 10 (§ 667.61, subd. (e)(1)); and committed a qualifying sex offense against more than one victim (§ 667.61, subd. (e)(4), (5)). In addition, Flores was charged with, and pled guilty to, possession of child pornography. (§ 311.11, subd. (a)–count 12.)

The jury convicted Flores on counts 1 through 11 and found true the kidnapping and multiple-victim enhancements. The court sentenced Flores to a total term of 210 years plus a consecutive term of life without the possibility of parole.

On appeal, Flores contends (1) the court erred in denying his motion to suppress statements he made to police during a custodial interrogation, arguing they were obtained in violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 *(Miranda)*; (2) the prosecutor committed misconduct during closing argument by misstating the elements of the

---

[1]    All further statutory references are to the Penal Code unless otherwise noted.

[2]    Effective January 1, 2019, this provision was renumbered as section 287.  (See Stats. 2018, ch. 423, § 49 (Sen. Bill No. 1494).)

charged offenses; (3) the court also erred by failing to instruct on the lesser included offenses in counts 1 through 4, and 6 through 9, and misinstructed on the asportation element in connection with count 10; (4) no substantial evidence supports the true finding on the kidnapping enhancement in count 10; (5) these errors cumulatively prejudiced him; and (6) there are clerical errors in the trial court minutes that must be corrected.

As we explain, we agree with Flores the trial court minutes must be corrected, as the People concede. The judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND
### *The Disclosure of Sexual Abuse by Does 1 and 2*

Doe 1 (counts 1-5) was born in September 2006. Her sister Doe 2 (counts 6-11) was born in January 2008. Flores is their paternal grandfather. From about 2007 to 2013, Does 1 and 2, along with their mother (Mother) and father (Father), lived in Flores's home in Eastvale, California. Mother, Father, and their two daughters shared a downstairs bedroom. Also living in the home were Flores and his wife (Grandmother), their two teenage sons, and their daughter and her husband.

Beginning in about 2009, Mother worked nights. Father worked on and off but when working it would be in 12-hour shifts. Typically Grandmother watched Does 1 and 2 during the day. Flores at times was also home during the day, as he worked mostly nights. Does 1 and 2, who enjoyed a close relationship with Flores, were taught to listen to their grandparents when in their care.

Flores also owned a home in Pomona, California, where he sometimes would take Does 1 and 2. After Mother and Father separated in about 2013, the two girls would spend weekends with their father, who remained living with his parents in their Eastvale home.

In October 2017, Mother and Does 1 and 2 were living with Mother's mother in Pomona. Doe 1 was 11 years old and Doe 2 was 9. Doe 1 and Mother watched a television show about an "abused" child who did not report the abuse. After the show, Mother commented to Doe 1, "if something like this ever happens to you, baby, you guys need to tell me. Don't be scared." A few minutes later, Doe 1 told her mother, "it happened to [me]," disclosing Flores "put his private in my private."

As Doe 1 and Mother sat on the couch crying, Doe 2 walked by and asked what was wrong. Doe 1 then looked at her sister and said, "I told mom about grandpa." Mother saw Doe 2 appeared scared and upset. Doe 2 then disclosed that she too had been sexually abused by Flores. Doe 1 told Mother that the abuse started when she was about four years old, and ended when she was approximately seven. Doe 2 then could not recall when the abuse started.[3] Mother immediately called Father and informed him of their daughters' disclosures.

---

[3]     The record shows there were some minor inconsistencies in the statements and testimony of Does 1 and/or 2 regarding when the sexual abuse by Flores began. This perhaps can be explained by the number of incidents of abuse, the lapse in time between the incidents and disclosure, and the girls' young ages. As noted, Doe 1 told her mother the abuse began when she was about four years old. During her forensic interview, Doe 1 estimated it began when she was about five or six; and at trial she testified it began when she was in kindergarten/first grade. Doe 2 stated during the forensic interview that Flores began sexually abusing her when she was four years old, and testified similarly at trial. The record shows the court instructed the sexual offenses against Doe 1 began on or about September 2011, or when she was about five years old; and against Doe 2 on or about January 2011, when she was about three years old.

4

A few weeks later, Mother reported the abuse to police.[4] Thereafter at the urging of police, Mother made a pretext call to Flores from the station where Flores asked for forgiveness and admitted some of the incidents of sexual abuse. She also took her daughters for a medical examination.

### *Details of the Sexual Abuse*

In early December 2017, Does 1 and 2 were separately questioned by a forensic interviewer from the Riverside Child Protective Services. The interviews were videotaped and played for the jury. Transcripts of the interviews were included in the appellate record. Does 1 and 2 also testified at trial.

**Doe 1**

Doe 1 was 11 years old at the time of the interview. Doe 1 disclosed "grandpa" Flores put his "private into my private." By "private" she meant where you go "pee." Doe 1 recalled being "scared" and "crying" when Flores sexually abused her, which began when she was about five or six years old, and ended when she was seven, after she stood up to Flores.

Doe 1 told the investigator that after Flores sexually abused her, she had to watch him do the "same exact thing" to her sister. Doe 1 estimated Flores abused her and her sister more than 20 times; and stated all these incidents occurred in his bedroom with his door locked, and always when the girls were together. Afterwards, Flores would tell them not to tell anyone.

Doe 1 also reported that Flores "licked" their "privates." Flores licked Doe 1's privates when she was six and seven years old.

---

[4] Mother testified she initially debated whether to notify the police, as she did not want to put her daughters through "all of this" and have "nothing . . . happen to [Flores]." However, with her daughters' support, Mother made the decision to report the abuse.

Doe 1 recalled an incident (discussed *post* in connection with the kidnapping enhancement) in which she encouraged her sister to "escape" Flores as he was sexually abusing them in his bedroom. In this particular incident, Doe 1 told her sister "to go downstairs and get grandma." Doe 2 left the room but instead ran into the hallway bathroom. Flores in response "put his pants on" and went and retrieved Doe 2 from the bathroom, bringing her back into his bedroom. As a result of this incident, Doe 1 stated Flores began holding the girls down by their hands when he abused them to prevent them from running away.

Doe 1 was 14 years old and in eighth grade when she testified at trial. She told the jury Flores began sexually abusing her when she was in kindergarten/first grade, while her family was living in her grandparents' home and she was being cared for by Grandmother. The abuse occurred when Grandmother was downstairs, where she spent most of the day playing loud music while cooking and cleaning.

Doe 1 recalled one of the first incidents of sexual abuse by Flores. She was about five or six years old. He summoned Does 1 and 2 to come upstairs. At Flores's direction, Doe 1 laid on her back on his bedroom floor, with Doe 2 next to her. Doe 1 did not understand what was happening. Next, Flores pulled down the underwear of Doe 1 and Doe 2. He then "lick[ed]" Doe 1's "private parts." Next, he put his "penis" "into her private part," which she confirmed was her "vagina." While on top of Doe 1, Flores used his hands to hold her down with enough force it hurt.

After Flores sexually abused Doe 1, she watched him do the same to her sister. Doe 1 testified Flores would "take[] turns." Doe 1 estimated Flores sexually abused her in this way—licking her vagina and "stick[ing] his

6

penis inside of [her]"—more than 10 times. On each occasion Doe 2 was present.

Doe 1 recalled Flores also used his computer to show her and her sister images of naked girls. The computer was located upstairs in a loft, next to the master bedroom. He also showed them videos and asked Doe 1 to "dance" for him like the people in the video, which Doe 1 described as women dancing like "stripper[s]." The videos also showed women giving what Doe 1 described as "lap dances," or a woman "dancing on top of a man."

When she was about 10 years old, Doe 1 decided to disclose the sexual abuse by Flores. Doe 1 made the decision after watching a television show with Mother dealing with sexual abuse of children. Doe 1 told Mother that Flores had sexually abused her. Mother in response "burst[] into tears." Doe 1 added, "I never wanted my mom to go through that." It was then her sister disclosed she too had been sexually abused by Flores.

**Doe 2**

Doe 2 was nine years old and in third grade when she was interviewed by child protective services. She told the interviewer that her "grandpa" "put his middle part in my middle part and, um, it hurt." By "middle part," she meant where they both went "[p]ee." Doe 2 estimated she was about four years old when Flores began sexually abusing her. The abuse occurred when Grandmother was downstairs, listening to loud music.

Doe 2 described an (uncharged) incident that occurred at a hotel in Mexico, where Flores put his penis into "where I go Number 2 and it hurt more than it hurt in here," pointing to her frontside. Doe 2 added, "And . . . he didn't stop. He didn't say nothing. I told him it was hurting but he didn't stop. He just kept on doing it." The incident occurred after Doe 1 had gone to the swimming pool with their Grandmother. While putting on

her bathing suit, Flores "pulled" Doe 2 to the couch, took off her suit, and "put his in and it hurt." When asked where Flores put his penis, Doe 2 stated, "In my butthole." After this incident, Doe 2 said it "hurt" when she used the bathroom.

After her parents separated, Doe 2 estimated Flores sexually abused her "every weekend" when she and her sister had overnight visits with Father in the Eastvale home. Doe 2 stated Flores sexually abused her and her sister a "few times" at the "same time," but not every time as Doe 1 had disclosed.

Doe 2 described an incident when she was six years old that took place at Flores's Pomona home. After Grandmother left to go shopping, Flores made both girls "take off all of [their] clothes and dance" on a "little pole" inside the home. Doe 2 described the "dancing" as "twirling" and going "up and down."

Flores, while watching the girls "dancing," began touching his exposed "peeing thing." He instructed the girls to stop and quickly " 'change[]' " when they heard Grandmother drive up. Doe 2 overheard Flores tell his wife the girls were playing in another room, when Grandmother asked about their whereabouts. Doe 2 told the interviewer, "Well, we weren't. We were changing because he made us do that."

On one occasion when Flores did not lock his bedroom door, Doe 2 "peeked" inside and saw Flores "doing it" to her sister, which Doe 2 described as him putting the "thing he pees with" in Doe 1's "peeing part." Doe 2 was too afraid of Flores to tell Grandmother.

During the interview, Doe 2 also disclosed Flores kissed her on the mouth and nipples, and "lick[ed]" her "peeing thing" "before he put his, um,

8

private part in [her] private part." After these incidents, Flores would instruct Doe 2 not to tell anybody.

Doe 2 also described seeing videos on Flores's computer, in which "older mans [were] doing it like to little kids, like he did to us." The last time Flores showed Doe 2 such a video, she asked him for $100. She added, "He's like— he was watching the video. I'm like, 'Can I have $100, please.' And then, um, he was all like, 'Only if you do this'" while pointing to his computer. Doe 2 responded, "'Never mind.'" Doe 2 saw Flores watch videos of "little girls" more than one time, and felt "really bad for those little kids."

At the time of trial, Doe 2 was 12 years old and in sixth grade. She told the jury her parents worked a lot when they lived with her grandparents. Grandmother watched Doe 2 and her sister during the day, while their parents worked. Sometimes Flores would be home as well. Grandmother liked to listen to loud music and was usually downstairs.

While growing up, Doe 2's parents taught her to "respect her elders." Doe 2 explained this meant "to do whatever they tell you to do."

Doe 2 testified Flores began sexually abusing her when she was about four or five years old, and continued doing so until she was about nine. The abuse occurred inside Flores's bedroom, on the floor and his bed, and in a walk-in closet. The abuse included Flores kissing her on the lips in a sexual manner; putting his "private," which she confirmed was his penis, next to her "private," which she confirmed was her vagina, and rub[bing] it" back and forth "in the hole where you go pee" but not in the place where the "sperm

9

meets the egg";[5] and "licking" her vagina. Doe 2 waited to disclose Flores's sexual abuse because she was afraid he would "hurt" her.

Doe 2 estimated Flores sexually abused her once or twice on his bedroom floor; more than two times on his bed; and more than 10 times in the closet. She told the jury Doe 1 was in the room with her at least four times when Flores sexually abused both of them.

Doe 2 recalled Flores watched videos of "little kids like [her] and grown men like him doing what he would do to [her]." Doe 2 estimated the girls in the videos were 11 or 12 years old. Flores told Doe 2 the girls in the videos were his "friends," and on one occasion asked Doe 2 to do the same things to him that the girl in the video was doing to a grown man.

Doe 2 also testified about the incident that occurred in Flores's home in Pomona. On this occasion, Doe 2 and her sister were playing on some "poles" inside the home when Flores asked the girls to "spin around" the poles, and then began "playing" with his exposed penis. Flores stopped when they all heard Grandmother "pulling up the driveway" in her car.

Doe 2 at trial could not recall the incident from Mexico that she described in her forensic interview. Nor could she recall the incident when she ran out of Flores's bedroom into the hallway bathroom, after her sister told her to go downstairs and tell Grandmother about the sexual abuse.

---

[5] Doe 2's testimony whether Flores penetrated her vagina with his penis is somewhat inconsistent, as the defense argued in closing. The jury found there was penetration in convicting Flores on counts 6 and 7—a finding he has not challenged on appeal.

## *Investigation*

### Medical Examination

After they reported the sexual abuse, nurse Tonia M. examined Does 1 and 2 and found no indication of past trauma. Tonia, however, told the jury she did not expect to find any because the "anal/genital area" of the body is "designed to heal very quickly," and "even a small tear" in this region "will be healed within three days depending on the size of it."

Tonia testified she asked Doe 1 why she (Doe 1) was undergoing a medical examination. Doe 1 responded it was because of her "grandpa" and what he "had done" to her, explaining, "[h]e put his boy part in her part" while pointing to her "vaginal area." Tonia also spoke to Doe 2, and she too was able to identify "which body parts were what." Doe 2 understood she was undergoing the exam because "her grandpa had sexual[ly] abused her and her sister."

### Pretext Call

Mother's pretext call to Flores was recorded and played for the jury. A transcript of the recording (in both Spanish and English) was part of the appellate record. Sergeant Julio Olguin of the Riverside County Sherriff's Department arranged the call.

In the very beginning of the call immediately after Mother identified herself, Flores volunteered, "Forgive me . . . . Forgive me from the bottom of my heart," to which Mother responded, "I can't." During their conversation, Flores initially refused to answer "over the phone" Mother's questions about what he had done to his granddaughters. However, as the conversation continued, Flores said, "My dear—my dear, understand it, that was like 7 years ago. I've lived with it. [Inaudible.] . . . I know I did something bad. . . .

11

But, from the bottom of my heart I'm telling you that I didn't have any bad intentions when I did it, really, I swear to you."

Mother accused Flores of "scar[ring]" her daughters for "life." Flores disagreed, stating they were being scarred from the "current situation" including as a result of the police investigation. Flores commented that others were hurting for "something that [he] did," then volunteered, "Yes, Yes, I-I-I stand by it, I did it. My dear, forgive me, from the bottom of my heart."

Mother again demanded Flores tell her what he had done. Flores said, "I only touched them. That was it." After more back and forth, Flores admitted he "grop[ed]" the girls' "privates," but claimed he "didn't do it with . . . bad intentions." Mother accused Flores of "kiss[ing] them down there." Flores did not deny it, instead saying, "[M]y only mistake . . . is having permitted it." He did, however, deny putting his "private inside of theirs," exclaiming, "I never inserted nothing in them."

**Flores's Computer**

Investigator Wade Walsvick of the Riverside County District Attorney's Office conducted a forensic examination of Flores's computer pursuant to a validly issued search warrant. Investigator Walsvick told the jury he discovered about 45 to 50 videos of "child pornography" on the computer; and conservatively estimated the overall age range of the minors in the videos was "between 4 and 14" years old, with the average being under 10.

Some of the videos involved girls between the age of four and six, similar to the ages of Does 1 and 2 when the sexual abuse began. In one particular video that lasted about two minutes, Investigator Walsvick described a six-year-old girl having sexual intercourse with an adult male. Investigator Walsvick also found other videos on Flores's computer involving

12

four- and five-year-old girls engaged in what he described as "more egregious sexual acts" than in the two minute video, including oral copulation between a young female and an adult male.

## DISCUSSION

### I. Motion to Suppress

Flores contends the trial court erred in denying his motion in limine to suppress statements he made to Sergeant Olguin during a custodial interrogation, claiming they were obtained in violation of *Miranda*.[6]

### A. *Additional Background*

The court held an Evidence Code section 402 hearing prior to determining the admissibility of Flores's statements. Sergeant Olguin was the only witness to testify.

Sergeant Olguin was in the sex crimes unit and investigating the instant case when he and his partner contacted Flores at his home on December 6, 2017. Flores willingly agreed to be driven to the police station to speak with the officers.[7]

### 1. The Interrogation

After obtaining about 15 minutes of background information, Sergeant Olguin told Flores he wanted to hear his side of the story. Flores responded, "Yes, correct." Sergeant Olguin stated he needed to read Flores his "rights," "because you have rights, okay," to which Flores responded, "Yes, right."

---

[6]     The People also moved in limine to admit Flores's statements to the sergeant.

[7]     Sergeant Olguin is a native Spanish speaker. He and Flores spoke Spanish during the interrogation. However, the certified transcript of the interrogation is in both Spanish and English.

Sergeant Olguin read Flores (in Spanish) his *Miranda* rights.[8] Flores responded, "Yes, those are my rights." Sergeant Olguin then asked the question, "Okay. Why are we here? What's happening?" and the interview continued without Flores invoking his rights.

A few minutes later, the following colloquy took place:

> "Flores: Now, eh, when you read, ah, read me the rights . . .
>
> "Olguin: Mm-hm.
>
> "Flores: . . . uhm, do I need, ah, to have an attorney or— or I could also get . . .
>
> "Olguin: If you want one, you can have one but like I explained to you, yes, you can have one here, eh, of course—fully yes, those are your rights.
>
> "Flores: Uh-huh.
>
> "Olguin: But I just want to get the story. What was what is happening?
>
> "Flores: Well, there's really nothing happening because, ah, an incident happened like seven years ago.
>
> "Olguin: Okay, but I don't want to force you to speak a—about nothing, okay?
>
> "Flores: Uh-huh.

---

8    Sergeant Olguin: "Okay. You have the right to remain silent. Everything that you—that you say, can and will be used against you in a court of law. You have the right to speak with an attorney and have him present with you while you are being interrogated. Okay? If you can't pay for an attorney, one will be appointed for free to represent you before any interrogation if you wish to do so. Okay? You understand your rights?"

"Olguin: If you're [unintelligible] and it's because you want to chat with me. I just want to find out what's happening. I have one side of the story . . .

"Flores: That's why, that, eh . . .

"Olguin: But I just want to get your . . .

"Flores: Uh-huh. Uh-huh.

"Olguin: . . . and explain that about the—maybe it happened, maybe nothing happened [unintelligible] . . . ."

Flores's interview lasted about an hour and a half. During the interview, which transcript we have reviewed in its entirety, Flores admitted: he "caress[ed]" and "rubb[ed]" Doe 2's vagina over her clothes on two different occasions; he "put [his] mouth" on Doe 2's vagina; Doe 2 "grab[bed]" his exposed penis; he touched Doe 1's vagina one time; and he had child pornography on his home computer possibly involving "teens," which one or both of the girls might have seen. At the end of the interview, Flores was arrested.[9]

## 2. The Court's Ruling

At the conclusion of the Evidence Code section 402 hearing, the prosecutor argued Flores was not in custody when Sergeant Olguin, out of an "abundance of caution," read Flores his *Miranda* rights. The prosecutor also argued that Flores, after acknowledging those rights, in any event impliedly waived them by continuing to speak with the sergeant; that Flores did not unambiguously invoke his right to counsel a few minutes later; that Sergeant

_____

[9] Flores also told Sergeant Olguin he "could" have put his mouth on Doe 1's vagina, penetrated Doe 1's and Doe 2's vaginas with his penis at least once, and penetrated Doe 2's anus with his penis at a hotel in Mexico.

15

Olguin nonetheless confirmed Flores's right to counsel, which Flores again acknowledged; and that Flores voluntarily continued with the interview.

Flores argued he was in custody when Sergeant Olguin gave the *Miranda* advisement. As he does on appeal, Flores also argued that the sergeant had an obligation to clarify whether Flores was invoking his right to counsel after he inquired about his rights a few minutes later, particularly since it appeared Flores was "cut off" mid-sentence by the sergeant.

Although noting it was a "close call," the court ruled Flores was in custody while being interrogated by Sergeant Olguin (a ruling the People do not challenge on appeal). The court, however, tentatively ruled to deny Flores's motion to suppress, finding that Flores's subsequent question about his right to counsel "was not an unambiguous or unequivocal invocation."

The following day, the court indicated it had reviewed portions of the video recording of Flores's interrogation, the caselaw provided by the parties, and the People's supplemental brief. After hearing additional argument, the court confirmed its ruling that Flores was in custody during the interrogation; that Flores received *Miranda* warnings and indicated he "understood those rights when he responded to Olguin"; and that Flores impliedly waived those rights when he "began to freely and voluntarily talk with Sergeant Olguin." The court added, "[I]n viewing the video, the setting was not coercive or pressure-packed or intimidating. It was very casual and relaxed."

Next, the court also confirmed its tentative that Flores had not unambiguously invoked his right to counsel when "he asked a question, basically, ['D]o I need to have an attorney?[']" (as summarized *ante*). The court found Sergeant Olguin in response "reaffirmed, and not readvised" Flores of his right to counsel, told Flores he was not being "force[d]" to talk,

16

and Flores replied he understood.  The court therefore found no *Miranda* violation.

## B.  *Guiding Principles*

A defendant may invoke, or attempt to invoke, his or her *Miranda* rights at different times during a custodial interrogation.  The first is after police initially give a *Miranda* warning.  The second is after an initial waiver of *Miranda* rights, when, during the course of an interrogation, the defendant invokes the right to remain silent and/or consult with an attorney.  Some courts refer to the former as a "prewaiver," and the latter as a "postwaiver," case.  (See e.g., *People v. Duff* (2014) 58 Cal.4th 527, 553 (*Duff*); *United States v. Rodriguez* (9th Cir. 2008) 518 F.3d 1072 (*Rodriguez*).)

Citing *Duff*, *supra*, 58 Cal.4th 527 and *Rodriguez*, *supra*, 518 F.3d 1072, Flores contends his is a prewaiver case because his question to Sergeant Olguin about the right to counsel occurred within minutes of his receipt of *Miranda* rights.  Flores therefore contends that Sergeant Olguin was *required* to clarify whether Flores was invoking his right to counsel before continuing with the interrogation; and that the sergeant's failure to do so violated *Miranda*.

In making this contention, Flores recognizes that postwaiver law does not require police to clarify a defendant's subsequent invocation of *Miranda* rights when the invocation is ambiguous.  (See *Davis v. United States* (1994) 512 U.S. 452, 461-462 (*Davis*) [recognizing in a postwaiver case that police have no obligation to ask clarifying questions and may continue questioning the suspect]; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217-218 (*Sauceda-Contreras*) [officers may, but are not required to, clarify a defendant's subsequent ambiguous invocation of his or her *Miranda* rights after initially waiving those rights]; cf. *Smith v. Illinois* (1984) 469 U.S. 91,

17

98 [when a suspect makes an unambiguous invocation of *Miranda* rights, all questioning must immediately cease].)

When reviewing a trial court's ruling on an alleged *Miranda* violation, we accept the court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. (*People v. Leon* (2020) 8 Cal.5th 831, 843 (*Leon*).) However, if, as in the instant case, a defendant's interrogation is recorded and the facts surrounding the admissions are undisputed, we apply independent review. (*Ibid.*; see *People v. Rundle* (2008) 43 Cal.4th 76, 115 (*Rundle*) [concluding independent review applies to the court's legal determinations of whether a defendant's *Miranda* waiver was knowingly, intelligently, and voluntarily made, and whether his or her reference to a lawyer constituted an unambiguous invocation of the right to counsel]; *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125 [same].)

## C. *Analysis*

We need not decide whether the instant case is a prewaiver or postwaiver case because we independently conclude there was no *Miranda* violation in either instance. (See *Leon*, *supra*, 8 Cal.5th at p. 843; see also *People v. Zapien* (1993) 4 Cal.4th 929, 976 [we review the trial court's decision, not its reasoning, and will affirm if the court reached the correct result " ' "regardless of the considerations [that] may have moved the trial court to its conclusion" ' "]; accord *People v. Financial Casualty & Surety, Inc.* (2017) 10 Cal.App.5th 369, 386.)

### 1. Prewaiver

Assuming without deciding Flores is correct that (1) his is a prewaiver case because his question about the right to counsel occurred within minutes of his original receipt of *Miranda* warnings; and therefore, (2) Sergeant Olguin was under a duty to clarify whether Flores was invoking that right

18

(see *Duff*, *supra*, 58 Cal.4th 527; *Rodriguez*, *supra*, 518 F.3d 1072);[10] we conclude the sergeant's response was adequate to the task. After hearing Flores's question, which went to the nature of his right to counsel, Sergeant Olguin responded, "If you want one, you can have one but like I explained to you, yes, you can have one here, . . . of course-fully [sic] yes, those are your rights." Flores responded, "Uh-huh," as he did in numerous instances during the interrogation, acknowledging his understanding without seeking further explanation. Sergeant Olguin then provided additional information about the nature of the interrogation, and confirmed Flores was not required to answer questions, as summarized *ante*. Flores then gave repeated affirmative responses to these statements.

---

10    We question whether *Duff* imposes a duty on police to clarify a defendant's equivocal response to an initial *Miranda* advisement, as Flores argues. (See *Duff*, *supra*, 58 Cal.4th at p. 553 [noting "[i]n the face of an initial equivocal reference to counsel, we have held that an officer is *permitted* to clarify the suspect's intentions and desire to waive his or her *Miranda* rights," which the officer in fact had done in the case before it (italics added)].) *Duff* therefore never decided whether an officer in a prewaiver case is duty-bound to seek clarification before initiating substantive questioning. Moreover, *Duff* cited to *Berghuis v. Thompkins* (2010) 560 U.S. 370, 381 (*Berghuis*), which postdated *Rodriguez* and which held that, when a defendant makes an "ambiguous or equivocal" invocation of his or her *Miranda* rights or makes no statement at all, "the police are not required to end the interrogation . . . or ask questions to clarify whether the accused wants to invoke" those rights. We thus question whether *Rodriquez* remains good law in light of *Berghuis*, as *Duff* implies. (*Duff*, *supra*, 58 Cal.4th at p. 553; *Rodriguez*, *supra*, 518 F.3d at p. 1080 [the police in a prewaiver case are duty-bound to clarify whether the defendant waived his right to remain silent based on his ambiguous statement, "I'm good for tonight"].) Because, as we discuss, Sergeant Olguin did in fact clarify whether Flores was invoking his right to counsel, we need not decide in this case whether he was *required* to do so.

It is settled that an express waiver of *Miranda* rights is not required where a defendant's actions make clear that a waiver is intended. (*North Carolina v. Butler* (1979) 441 U.S. 369, 374-375 (*Butler*); *People v. Whitson* (1998) 17 Cal.4th 229, 250; *People v. Medina* (1995) 11 Cal.4th 694, 752.) Although the waiver may not be inferred "simply from the silence of the accused after warnings are given or simply from the fact that the confession was in fact eventually obtained" (*Miranda, supra*, 384 U.S. at p. 475), waiver may be inferred where "the actions and words of the person interrogated" clearly imply it (*Butler*, at p. 373).

To find waiver, "[f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Moran v. Burbine* (1986) 475 U.S. 412, 421 (*Moran*).)

Here, the record shows Flores was advised of his *Miranda* rights in Spanish, he acknowledged receiving them, and within minutes of receipt of those rights, Sergeant Olguin clarified for Flores he had a right to counsel and was not being "force[d]" to talk. Sergeant Olguin thereafter permissibly resumed his questioning of Flores, who answered Sergeant Olguin's questions without invoking his right to remain silent or to counsel. (See *Moran, supra,* 475 U.S. at p. 421; *Butler*, *supra,* 441 U.S. at p. 373.)

The record also shows that the interrogation was neither lengthy nor "coercive," "pressure-packed or intimidating," but instead was "very casual

and relaxed" as the trial court found, and as we have confirmed from our own review of the record.  (See *Leon, supra,* 8 Cal.5th at p. 843.)  The record also shows during the interrogation Sergeant Olguin repeatedly offered Flores water and asked if he needed to use the bathroom; and, when Flores became upset, attempted to calm him by inquiring if he was "all right" and whether he needed "anything."

Moreover, during the interrogation Flores at times volunteered information without even being questioned.  By way of example only, after reading Flores his *Miranda* rights, Sergeant Olguin thanked Flores for agreeing to "chat" and asked to hear his side of the story, as summarized *ante.*  Flores told Sergeant Olguin "nothing happen[ed]," to which the sergeant merely responded, "Okay."  Before Sergeant Olguin could ask another question, Flores volunteered, "Ah, it happened seven years ago."

Throughout the interrogation, Flores repeatedly stated he loved Does 1 and 2, whom he referred to as his "princesses," and meant no harm to them.  Flores's love for his two granddaughters and his remorse for what had happened years earlier further supports the inference his *Miranda* waiver was knowing and voluntary, as Flores appeared to want to get what he had done "off his chest."[11]  (See *People v. Spears* (1991) 228 Cal.App.3d 1, 27 (*Spears*) [finding a detective's post-*Miranda* comments to a defendant that it was "time [he] got this off [his] chest" and that defendant "would be better off once he gave them 'the scoop' " as nothing more than the benefit which would naturally flow from pursuing a truthful and honest course of conduct]; see also *Moran, supra,* 475 U.S. at p. 421; *Rundle, supra,* 43 Cal.4th at p. 115.)

_____

11    Flores's desire to tell the truth and his remorse for what he had done to Does 1 and 2 were also apparent in the pretext call (summarized *ante*), when he repeatedly apologized to Mother from the "bottom of his heart."

Based on the totality of the circumstances including from Flores's words and actions, we independently conclude his relinquishment of *Miranda* rights—including the right to counsel, as clarified by Sergeant Olguin—was the "product of a free and deliberate choice." (See *Moran*, *supra*, 475 U.S. at p. 421; *Leon*, *supra*, 8 Cal.5th at p. 843; see also *People v. Cunningham* (2015) 61 Cal.4th 609, 642 (*Cunningham*) ["In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them."]; *Spears*, *supra*, 228 Cal.App.3d at p. 27.)

### 2. Postwaiver

We evaluate the invocation of *Miranda* rights postwaiver from the point of view of a reasonable police officer in the circumstances. (*People v. Case* (2018) 5 Cal.5th 1, 20 (*Case*).) "Although officers may seek clarification of an ambiguous request, they are not required to do so." (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1087 (*McCurdy*); *Davis*, *supra*, 512 U.S. at pp. 461-462.)

Based on the record before us, we conclude Flores's postwaiver *question* about the "need" for an attorney was not a clear and unambiguous invocation of his right to counsel, as understood from the standpoint of a reasonable police officer. (See *Case*, *supra*, 5 Cal.5th at p. 20; see also *People v. Molano* (2019) 7 Cal.5th 620, 659 [the defendant's statement he would " 'feel more comfortable' if he spoke to a public defender first . . . did not amount to a 'clear assertion' of the right to counsel"]; *McCurdy*, *supra*, 59 Cal.4th at p. 1087 [a defendant's postwaiver invocation of his or her *Miranda* rights must be unambiguous]; *Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 219 [finding the defendant's statement, after receiving his *Miranda* advisement,

22

" 'If you can bring me a lawyer, that way I[,] I with who . . . that way I can tell you everything that I know and everything that I need to tell you and someone to represent me,' " was " 'conditional, ambiguous, and equivocal' "].)

Despite Flores's ambiguous invocation and despite therefore having no duty to clarify in a postwaiver case (see *McCurdy*, *supra*, 59 Cal.4th at p. 1087), as we have noted Sergeant Olguin nonetheless confirmed Flores's right to counsel and Flores continued with the interrogation. For this additional reason, we infer from Flores's words and conduct that, subsequent to his ambiguous invocation, he knowingly and voluntarily waived his *Miranda* rights. (See *Berghuis*, *supra*, 560 U.S. at p. 382; *Moran*, *supra*, 475 U.S. at p. 421; *Cunningham*, *supra*, 61 Cal.4th at p. 642.) We thus independently conclude the court properly ruled to admit Flores's statements. (See *Leon*, *supra*, 8 Cal.5th at p. 843.)

## II. Prosecutorial Error

Flores contends the prosecutor committed prejudicial error during closing argument by telling the jury the legal age of consent is 18 and by implying that, because Does 1 and 2 were young children when the offenses were committed, they could not consent for the aggravated sexual assault and forcible rape/oral copulation offenses charged in counts 1 through 4 and 6 through 9 (sometimes, Forcible Sex Offenses).

### A. *Additional Background*

The Forcible Sex Offenses each required proof that the charged acts were committed against the other person's will (§§ 269, subd. (a)(1), (4) [aggravated sexual assault]); 261, subd. (a)(2) [rape]; former 288a, subd. (c)(2)(B) [oral copulation]); and that the acts were not consensual (see *People v. Oliver* (2020) 54 Cal.App.5th 1084, 1094-1095). Flores on appeal does not

23

dispute that the court properly instructed on the Forcible Sex Offenses under

CALCRIM Nos. 1000,[12] 1015,[13] and 1123.[14]

---

[12] The court instructed with CALCRIM No. 1000, "Rape by Force, Fear, or Threats (Pen. Code, § 261(a)(2))," in part as follows: "The defendant is charged in Counts 2 and 7 with rape by force in violation of Penal Code section 261(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant had sexual intercourse with a woman; [¶] 2. He and the woman were not married to each other at the time of the intercourse; [¶] 3. The woman *did not consent* to the intercourse [italics added]; [¶] AND [¶] 4. The defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else. [¶] . . . [¶] To *consent*, a woman must act freely and voluntarily and know the nature of the act."

[13] The court gave CALCRIM No. 1015, "Oral Copulation by Force, Fear, or Threats ([Former] Pen. Code, § 288a(c)(2))," in part as follows: "The defendant is charged in Counts 4 and 9 with oral copulation by force in violation of [former] Penal Code section 288a(c)(2). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act of oral copulation with someone else; [¶] 2. The other person *did not consent* to the act [italics added]; ¶] AND [¶] 3. The defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to someone. [¶] . . . [¶] In order to *consent*, a person must act freely and voluntarily and know the nature of the act."

[14] The court instructed as follows with CALCRIM No. 1123, "Aggravated Sexual Assault of Child Under 14 Years (Pen. Code, § 269(a))": "The defendant is charged in Counts 1, 3, 6, and 8 with aggravated sexual assault of a child who was under the age of 14 years and at least seven years younger than the defendant in violation of Penal Code section 269(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed Rape or Oral Copulation by Force, Fear or Threats on another person; [¶] AND [¶] 2. When the defendant acted, the other person was under the age of 14 years and was at least seven years younger than the defendant. [¶] To decide whether the defendant committed Rape and Oral Copulation by Force, Fear or Threats, please refer to the separate instructions that I will give you on those crimes."

24

After the close of evidence, outside the presence of the jury the court and parties discussed the instructions on the consent element of the Forcible Sex Offenses. The prosecutor requested the court instruct "that the legal age of consent is 18." Defense counsel opposed this request, asking the court to "stick to the [CALCRIM] instructions" as written. The court stated it was inclined to give the instructions as written, but was willing to consider a "special instruction" if the prosecutor made the request "in writing." The record shows the court ended up giving no instruction regarding the legal age of consent.

In closing argument in connection with count 2, the prosecutor argued Doe 1 "did not consent to the acts. She's under 18. She can't legally consent. She doesn't understand what's happening. Clearly that's not an issue here." As for count 1, the prosecutor noted the elements of this offense were the same as count 2, except the requirement the defendant was seven years older than Doe 1. The prosecutor then reviewed the elements of CALCRIM No. 1000, noting for this count that there was penetration, that Flores and Doe 1 were not married, and that Doe 1 "can't consent—all of those are the same things that we just talked about [in count 2]." The prosecutor made similar comments when discussing the charges involving Doe. 2.

The record also shows as the prosecutor made her closing argument she showed the jury PowerPoint slides. On the slides for counts 1 through 4, and 6 and 7, in parentheses next to the consent element were the words, "*Legal Age is 18*!" Defense counsel did not object to the prosecutor's remarks or slides regarding the legal age of consent.

However, defense counsel during her closing referenced the prosecutor's slides. Counsel paraphrased them as stating, "[C]an't consent under the age of 18," and noted this statement was not based on any of the

25

instructions.  Counsel explained, "[Y]ou don't want to confuse legal consent and actual consent here as defined, because if there is consent, it does mean that there's no[] force, duress or violence, or any of the other options.  And so somebody just being under the age of 18 doesn't negate that element.  [¶] That's—please look at the instruction the way that it's given to you by the Court."

In rebuttal, the prosecution responded that given the young ages of Does 1 and 2, they were unable to "act freely and voluntarily and know the nature of the act"; and thus, the consent element of the Forcible Sex Offenses was "clearly met."

After the conclusion of closing argument, defense counsel noted the court previously had denied the prosecutor's request to instruct that the legal age of consent was 18; and, despite the court's ruling, the prosecutor nonetheless argued this to the jury.  Counsel added, "I did whatever I could with respect to that one since it was already out there and told them to go back to the instruction."  At counsel's request, the court agreed to incorporate the slides into the record.

## B.  *Guiding Principles*

" ' " ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.]  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " ' " (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 241.)

26

"Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18 [(*Chapman*)], to the extent federal constitutional rights are implicated, and *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)] if only state law issues were involved." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) "Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127; *People v. Crew* (2003) 31 Cal.4th 822, 839 [same].)

We review de novo a defendant's claim of prosecutorial misconduct. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860.) " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.) We consider the prosecutor's remarks in context of the entire record. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 665-666 (*San Nicolas*).)

We presume, in the absence of evidence to the contrary, that the jury understands and follows instructions from the trial court (*People v. Fauber* (1992) 2 Cal.4th 792, 823 (*Fauber*)); and that the jurors treat the court's instructions as statements of law, and the arguments of the counsel as words spoken by an advocate in an attempt to persuade (*People v. Thornton* (2007) 41 Cal.4th 391, 441 (*Thornton*); see CALCRIM No. 222 [given by the trial court in the instant case in part as follows: "Nothing that the attorneys say is evidence. In their opening statement and *closing arguments*, the attorneys discuss the case, but their *remarks are not evidence*." (Italics added.)]).

## C. *Analysis*

It appears there was some confusion in the instant case between legal and actual consent. In *People v. Soto* (2011) 51 Cal.4th 229, 247 (*Soto*), the

27

Supreme Court observed that, in the context of the statute prohibiting lewd acts on a child (§ 288), "California law has long recognized that consent is not a defense when the victim of a sex crime is a child under the age 14." There is dicta in *Soto* to support the prosecutor's argument here that consent is also not a valid defense to aggravated sexual assault of a child under 14 when the underlying offense is forcible rape (or, as also in the instant case, oral copulation by force, fear, or threats). (*Soto*, at p. 238 ["For over 100 years, California law has consistently provided that children under age 14 cannot give valid legal consent to sexual acts with adults."].) However, we note this dicta arose in the context of construing a different statute (§ 288) for which—unlike forcible rape/oral copulation—lack of consent is not an element of the offense. (*Soto*, at p. 238 ["Lack of consent by the child victim is not an element of either lewd act offense defined in section 288."]; see *In re M.V.* (2014) 225 Cal.App.4th 1495, 1525, fn. 22 ["most of the cases citing the inability of a victim to consent to sexual activity have concluded, in addition, that lack of consent was not an element of the crime charged"].)

In contrast to the dicta in *Soto*, at least one Court of Appeal has held that lack of consent is an element of forcible rape even when the victim is under the age of 14. (*People v. Young* (1987) 190 Cal.App.3d 248, 257 ["Where, as here, the alleged victim is a child below the age of legal consent,

28

whether the child has the capacity to 'consent' to an act of sexual intercourse . . . will usually be a question of fact"].)[15]

Ultimately, we need not decide whether the prosecutor erred in arguing that Does 1 and 2 could not, due to their young ages, legally consent to the acts of intercourse and oral copulation with Flores. Instead, we conclude that if error occurred, it was not prejudicial even under the heightened *Chapman* beyond-a-reasonable-doubt standard. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

We note Flores in this case did not pursue a defense based on the actual consent of Does 1 and 2 to the sexual acts. As defense counsel noted during closing argument, Does 1 and 2 "were very young" when the sexual abuse by Flores began, and "were still young" when they disclosed the abuse. In fact, the jury was instructed the sexual offenses against Doe 1 began on or about September 2011, when she was about *five years old*, and against Doe 2 on or about January 2011, when she was about *three years old*. Moreover, counsel during closing argument told the jury that Flores admitted to "break[ing] the law" when he "touched" Does 1 and 2 because he "loves his

_____

[15]    The significance of the distinction between legal consent and actual consent may be explained by the severity of the punishment. "[W]hen the Legislature amended the rape statute in 1970 to exclude the act of sexual intercourse with a minor, and then created the separate crime of unlawful sexual intercourse with a minor (§ 261.5), it 'implicitly acknowledged that, in some cases at least, a minor may be capable of giving . . . consent to sexual relations.' [Citation.] The existence of such consent, of course, is the distinction between the crimes. Nonconsensual sexual intercourse with a minor still constitutes rape, and carries a higher penalty." (*People v. Hillhouse* (2003) 109 Cal.App.4th 1612, 1620.)

29

granddaughters very much" and felt "remorse for what he put them through."[16]

Given that Flores did not pursue a defense based on consent; that Does 1 and 2 were "very young" when Flores began sexually abusing them; and his concession that he loved his granddaughters "very much" and felt "remorse"; we conclude any purported error by the prosecutor about the girls' inability to consent was harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24; see also *San Nicolas*, *supra*, 34 Cal.4th at pp. 665-666 [we consider the prosecutor's remarks in context of the entire record when determining if there is error, and if so, if it is harmless].)

Our conclusion any error was harmless finds additional support from defense counsel's remarks in closing argument. As summarized *ante*, counsel told the jury the prosecutor appeared to confuse actual and legal consent, the prosecutor's remarks and slides were inaccurate statements of the law, and the jurors instead must follow the instructions given by the court. Absent evidence to the contrary, we presume the jury understood and followed the court's instructions on the Forcible Sex Offenses (see *Fauber*, *supra*, 2 Cal.4th at p. 823), as counsel reminded the jurors to do, and not the law as argued by

---

16 Counsel in her closing instead focused on the witness testimony of Does 1 and 2, and the alleged inconsistency between each other's testimony and/or that testimony and their recorded forensic interviews, in arguing the number of incidents of sexual abuse reported by Does 1 and 2 were exaggerated and the acts of abuse (i.e., penetration) were untrue.

the prosecutor (see *Thornton*, *supra*, 41 Cal.4th at p. 441; CALCRIM No. 222).[17]

## III. Lesser Included Offenses

The record shows Flores requested, and the court gave, an instruction on the lesser included offense of simple battery on the greater Forcible Sex Offenses (i.e., counts 1-4, and 6-9). Flores, however, contends the court erred in failing to instruct sua sponte on unlawful sexual intercourse with a minor (§ 261.5, subd. (c)), as a lesser included offense of aggravated sexual assault of a child by rape and forcible rape (counts 1, 2, 6, and 7); and on oral copulation with a minor (§ 287, subd. (c)(1)), as a lesser included offense of aggravated assault of a child by oral copulation and forcible oral copulation (counts 3, 4, 8, and 9).

The People agree that unlawful sexual intercourse with, and oral copulation of, a minor are lesser included offenses of forcible rape and forcible oral copulation, respectively, under the accusatory pleading test, discussed *post*. The People, however, argue the court had no duty to instruct on these lesser included offenses because there was no substantial evidence that

---

[17]  In light of our decision on the merits, we deem it unnecessary to reach the other arguments raised by the parties related to this issue, including the People's contention that Flores's forfeited this claim of error by failing to " 'make a timely and specific objection and ask the trial court to admonish the jury to disregard the [alleged] impropriety' " (see *People v. Clark* (2011) 52 Cal.4th 856, 960; see also *People v. Perez* (2018) 4 Cal.5th 421, 450 ["To avoid forfeiture of a claim of prosecutorial misconduct, a defendant must object and request an admonition"]); and Flores's alternate contention that, if defense counsel's failure to timely object forfeited this claim of error on appeal, he was deprived of effective assistance of counsel (see *People v. Urbano* (2005) 128 Cal.App.4th 396, 404 [concluding a defendant's claim of ineffective assistance of counsel was moot because the appellate court exercised its discretion to reach the merits of the defendant's challenges to his sentence]).

Flores was only guilty of these and not the greater offenses. The People further argue that, even if such a duty to instruct existed, any error in failing to do so was harmless.

## A. *Guiding Principles*

A trial court is required to instruct on lesser included offenses, even if (as here) the defense did not request it, if there was evidence from which the jury could have reasonably concluded that the lesser, but not the greater, offenses were committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149, 154-155, 162, 177 (*Breverman*).) We apply a de novo standard of review when considering whether a trial court failed to instruct on a necessarily included lesser offense. (*People v. Licas* (2007) 41 Cal.4th 362, 366 (*Licas*).)

A court will decide whether a crime is necessarily included by considering either the statutory elements of the greater offense (i.e., the elements test), or the facts alleged in the accusatory pleading (i.e., the accusatory pleading test). (*People v. Smith* (2013) 57 Cal.4th 232, 240 (*Smith*).) When considering the latter test, a court is only required to examine the accusatory pleading—in this case, the second amended information. (See *People v. Woods* (2015) 241 Cal.App.4th 461, 473; *Smith*, at p. 244 [the accusatory pleading test "does not require or depend on an examination of the evidence adduced at trial"].)

As explained by the Supreme Court in *People v Montoya* (2004) 33 Cal.4th 1031, 1035 (*Montoya*), when using the " 'accusatory pleading' " test, a court considers only whether the charging allegations contain language " ' " 'describing the offense in such a way that if committed as specified,' " ' " a lesser offense is necessarily committed at the same time. Courts have noted over the years that this test protects a defendant's right to due process by providing the accused with adequate notice before being

convicted of a lesser offense. (*Ibid.*, see *People v. Alvarez* (2019) 32 Cal.App.5th 781, 788 [discussing the dangers of reaching beyond the accusatory pleading].)

### B. *Analysis*

Under the elements test, it is clear that unlawful sexual intercourse is not a necessarily included lesser offense of forcible rape. Unlawful sexual intercourse is "an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor" (§ 261.5, subd. (a)) and is more than three years younger than the perpetrator "adult" (*id.*, subd. (c)).[18] Forcible rape "is an act of sexual intercourse accomplished . . . [with] a person who is not the spouse of the [perpetrator]" when "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).)

The greater offense of forcible rape does not require that the victim be a minor. As a result, forcible rape can be committed without also committing the lesser crime of unlawful sexual intercourse as defined by section 261.5. (See *Smith, supra*, 57 Cal.4th at pp. 240-241.) Accordingly, under the elements test, the court in this case had no sua sponte duty to instruct on the crime of unlawful sexual intercourse.

However, we agree with the parties that under the accusatory pleading test, the charged offenses of aggravated sexual assault and forcible rape necessarily subsumed the offense of unlawful sexual intercourse with a minor. The amended information alleged that when the acts of intercourse

---

18    Under section 261.5, subdivision (a), a "minor" is defined as a person under the age of 18 years and an "adult" as a person who is at least 18 years of age.

took place, Does 1 and 2 were under the age of 14 and seven or more years younger than Flores; and therefore, that in committing aggravated sexual assault by rape and forcible rape, Flores also violated section 261.5 by having sexual intercourse with Does 1 and 2 who were under the age of 18 and were more than three years younger than him.  (See *Smith*, *supra*, 57 Cal.4th at p. 244; *Montoya*, *supra*, 33 Cal.4th at p. 1035.)

Likewise, we agree with the parties that the charged offenses of aggravated sexual assault of a child by forcible oral copulation and forcible oral copulation were within the offense of oral copulation with a minor pursuant to former section 288a and section 287, subdivision (c)(1) under the elements test because all of the legal elements of the latter lesser offense are included in the offenses of the former greater offenses.  (See *Smith*, *supra*, 57 Cal.4th at p. 240.)

### 1.  No Substantial Evidence Supports Instruction of the Lesser Included Offenses

A "trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*Breverman*, *supra*, 19 Cal.4th at p. 162.)  " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' " that the lesser offense, but not the greater, was committed." (*Ibid.*)  "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury."  (*Ibid.*; see *People v. Moye* (2009) 47 Cal.4th 537, 553 [" '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.' "].)

34

The question before us is whether there is substantial evidence from which a jury could reasonably conclude that Flores committed the lesser offenses of unlawful sexual intercourse/oral copulation with Does 1 and 2 but not the greater offenses of aggravated sexual assault and forcible rape/oral copulation.

We conclude Flores has failed to identify substantial evidence that Does 1 and Doe 2 willingly engaged in the acts of sexual intercourse and oral copulation with him. For one thing, Flores denied penetrating the vaginas of Does 1 and 2 with his penis. For another, the girls were about four or five years old when the sexual abuse began, including penetration, as noted *ante*. And as also noted, Flores at trial did not pursue a defense based on consent.

Because, on this record, it was not possible for Flores to commit the lesser offenses of unlawful sexual intercourse/oral copulation without also committing the charged greater offenses of aggravated sexual assault and forcible rape/oral copulation, we independently conclude the court had no duty to instruct on the lesser included offenses. (See *Licas*, *supra*, 41 Cal.4th at p. 366.)

## 2. Harmless Error

We also conclude that, even if the trial court erred in failing to instruct on the lesser included offenses of unlawful sexual intercourse/oral copulation, the error was harmless. It is axiomatic that in noncapital cases, the failure to instruct sua sponte on lesser included offenses is reviewed under the *Watson* test; that is, whether it is reasonably probable Flores would have obtained a more favorable outcome if the court had given the lesser included instructions. (See *Breverman*, *supra*, 19 Cal.4th at pp. 165, 178; see also *id*. at 177 ["Appellate review under *Watson* . . . focuses not on what a reasonably

jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration."]; *Watson*, *supra*, 46 Cal.2d at p. 836.)

"In making [the *Watson*] evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, *supra*, 19 Cal.4th at p. 177.)

In the instant case, there is strong evidence that Flores committed the sexual offenses against Does 1 and 2 by means of force and duress. (See *People v. Jackson* (2014) 58 Cal.4th 724, 749 (*Jackson*) [a court examines the entire record and draws all reasonable inferences in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt].)

The evidence established that Flores used force to overcome the wills of Does 1 and 2 by holding them down with his hands, and by climbing on top of them as they laid side-by-side on the floor, as he "t[ook] turns" having sexual intercourse with, and orally copulating, them. (See *People v. Griffin* (2004) 33 Cal.4th 1015, 1027 [to find rape accomplished by force, the trier of fact must conclude only that the "use of force served to overcome the will of the victim to thwart or resist the attack," not that it "physically facilitated sexual penetration or prevented the victim from physically resisting her attacker"]; see *id.* at pp. 1020, 1029 [concluding the defendant used force to overcome the will of a 16- or 17-year-old victim when he pinned her arms to the floor "so that she was unable to move them," moved his body on top of her, and partially penetrated her vagina with his penis]; see also *People v. Thomas*

36

(2017) 15 Cal.App.5th 1063, 1072 [the defendant used force to overcome the will of his four- or five-year-old daughter by taking her by the hand into the bathroom, lifting her on the sink, and "penetrating [her] vagina"].)

The evidence of duress is also strong in this case. "Duress" means a "direct or implied threat of force, violence, danger, or retribution that would cause a reasonable person to do [or submit to] something that she would not do [or submit] to otherwise." (CALCRIM No. 1000; see *People v. Leal* (2004) 33 Cal.4th 999, 1004.) In determining whether a sexual offense such as rape or oral copulation was accomplished by duress, the trier of fact must consider the totality of the circumstances, including the victim's age and relationship to the defendant, the defendant's position of dominance over the victim, and the defendant's continuous exploitation of the victim. (*People v. Barton* (2020) 56 Cal.App.5th 496, 518.)

"Other relevant factors [of duress] include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family." (*People v. Cochran* (2002) 103 Cal.App.4th 8, 14 (*Cochran*).) "[A]s a factual matter, when the victim is as young as [nine years old] and is molested by her father in the family home, in all but the rarest cases duress will be present." (*Id.*, at p. 16, fn. 6.)

As summarized *ante*, Does 1 and 2, were about four or five years old when Flores, whom they adored, began sexually abusing them, including penetrating their vaginas with his penis and oral copulating them. Most of the sexual abuse occurred in Flores's upstairs bedroom, in the home the girls and their family shared with Flores, his wife, and other relatives. Both girls testified they that were afraid to disclose the abuse by Flores, and that after

the incidents he would instruct them not to tell anyone. (See *Jackson*, *supra*, 58 Cal.4th at p. 749.)

Conversely, the evidence is relatively weak that the two young girls willingly agreed to engage in the sex acts with their grandfather, a defense—as we have noted—Flores did not pursue in this case. We thus conclude any error in failing to instruct on the lesser included offenses of unlawful sexual intercourse and oral copulation was harmless. (See *Breverman*, *supra*, 19 Cal.4th at pp. 165, 178; *Watson*, *supra*, 46 Cal.2d at p. 836.)

Our conclusion any error was harmless finds further support in the jury's decision not to convict Flores of the lesser included defense of simple battery on any of the Forcible Sex Offenses. As noted, the court gave the simple battery instruction at Flores's request.[19] During closing, defense counsel argued that the jury should convict Flores, if at all, of this lesser included offense because there was no evidence he used force, duress and/or violence to overcome the wills of Does 1 and 2 in connection with the Forcible Sex Offenses. The jury's decision to convict Flores of the greater offenses and not the lesser offense of simple battery supports the conclusion any purported error in failing to instruct on *other* lesser necessarily included offenses was

_____

[19]    The court instructed with CALCRIM No. 960, "Simple Battery (Pen. Code, § 242)," as follows: "A lesser included offense to the crimes of Aggravated Sexual Assault, Rape, and Oral Copulation by Force, Fear or Threats is the crime of Battery in violation of . . . section 242. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully touched another person in a harmful or offensive manner. [¶] Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [¶] The slightest touching can be enough to commit a battery if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind."

harmless. (See *Breverman, supra*, 19 Cal.4th at p. 155; *Watson, supra*, 46 Cal.2d at p. 836.)[20]

## IV. Kidnapping Enhancement

Flores next contends there was insufficient evidence to support the asportation element of kidnapping in connection with count 10 because his movement of Doe 2 from the hallway bathroom to his bedroom, as described by Doe 1 during her forensic interview, was not a substantial distance. He also contends the court misinstructed the jury on asportation.

### A. *Additional Background*

The enhancement in count 10 provided in part that Flores kidnapped Doe 2 in violation of sections 207, 209, and 209.5 within the meaning of section 667.61, subdivision (e)(1).[21]

---

[20] Based on our conclusion that the court did not err in failing to instruct on the lesser included offenses in counts 1 through 4 and 6 through 9 and that, even if error, it was harmless, we reject Flores's additional contention his due process rights were allegedly violated in this case. In any event, the Supreme Court has rejected this identical argument. (See *Breverman, supra*, 19 Cal.4th at p. 165 [the United States Supreme Court has "expressly refrained from recognizing a federal constitutional right to instructions on lesser included offenses in noncapital cases"]; see *id.* at p. 169 ["[T]he rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law."].)

[21] Subdivision (e) of section 667.61 provides in relevant part: "The following circumstances shall apply to the offenses specified in subdivision (c) [which includes rape, in violation of paragraphs (2) and (6) of subdivision (a) of section 261, and oral copulation, in violation of paragraph (2) or (3) of subdivision (c) of section 287 or former section 288a]: [¶] (1) Except as provided in paragraph (2) of subdivision (d), the defendant kidnapped the victim of the present offense in violation of Sections 207, 209, or 209.5."

After the close of evidence and outside the presence of the jury, defense counsel moved under section 1118.1[22] for a judgment of acquittal on one or more of the charged offenses. As relevant here, counsel argued that photographs showed the exterior hallway bathroom was "fairly adjacent" to the front door of Flores's bedroom, and thus, that there was insufficient evidence of movement to support the kidnapping enhancement.

The prosecutor recounted Doe 1's statements (summarized *ante*) that as Flores was sexually abusing her, she told her sister to leave; that her sister opened the bedroom door and, according to the prosecutor, "ran down the hallway" and went into the bathroom to avoid also being abused; that Flores in response pulled up his pants, left the bedroom and "either baited [Doe 2] out [of the bathroom] or opened [the door] with a key"; and that he then took Doe 2 back into the bedroom, locked the door, and sexually abused her as charged in count 10.

The prosecutor argued that once in the hallway bathroom, Doe 2 was in a "more safe position" than in Flores's bedroom, as Doe 2 was closer to the stairs and Grandmother, who was downstairs in the kitchen; and that, after Flores took Doe 2 back into his bedroom and locked the door, the likelihood of detection decreased.

The court, after rereviewing the transcript of Doe 1's forensic interview and considering what it termed was the "low standard" in evaluating a

---

22    Section 1118.1 provides in relevant part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

section 1118.1 motion, found there was sufficient evidence to sustain a true finding on this enhancement, such that it should go to the jury for determination.

## B. *Guiding Principles*

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] . . . . We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 105-106.)

Further, if the record contains substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt, "the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 639 (*Taylor*).)

The court instructed with CALCRIM No. 3179, "Sex Offenses: Sentencing Factors—Kidnapping (Pen. Code, § 667.61(e)(1))," in part as follows: "If you find the defendant guilty of the crime charged in Count 10 [i.e., forcible lewd act upon a child under the age of 14 (§ 288, subd. (b)(1)],

41

you must then decide whether the People have proved the additional allegation that the defendant kidnapped Jane Doe [2]."

"[S]imple kidnapping" in violation of section 207, subdivision (a) requires proof of " 'three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.' " (*People v. Bell* (2009) 179 Cal.App.4th 428, 435 (*Bell*).) "This last element, i.e., that the victim be moved a substantial distance, is called the 'asportation' element." *(Ibid.)*

Unlike aggravated kidnapping (§ 209; CALCRIM No. 1203), simple kidnapping does not require proof of an increase in the risk of harm to the victim. (*People v. Martinez* (1999) 20 Cal.4th 225, 237 (*Martinez*); *Bell*, *supra*, 179 Cal.App.4th at pp. 436-437; see *People v. Arias* (2011) 193 Cal.App.4th 1428, 1435 [noting the only proof required for asportation in simple kidnapping is that " ' "the movement of the person was for a substantial distance" ' "].) However, because substantiality is based on the totality of the circumstances, " 'in a case *where the evidence permit[s]*, the jury *might* properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.' " (*Bell*, at p. 436 (second italics added), quoting *Martinez*, at p. 237.)

### C. *Analysis*

### 1. Substantial Evidence Supports the Asportation Element

As summarized *ante*, Flores moved Doe 2 from the hallway bathroom back to his bedroom, locked the door, and sexually abused her as alleged in

count 10.  Flores did so after Doe 1 told her sister to "go downstairs and get grandma."  Doe 2 left the bedroom but instead ran to the hallway bathroom.  By bringing Doe 2 back into his bedroom, a reasonable trier of fact could infer Flores prevented Doe 2 from getting help; gave him the opportunity to commit additional crimes against her; increased the risk of physical and psychological harm to her; and decreased the likelihood of detection, as Doe 1 stated the door to her grandfather's bedroom was always locked when he sexually abused them.  Based on this evidence, a reasonable trier of fact could find beyond a reasonable doubt that Flores's movement of Doe 2 from the hallway bathroom to his bedroom was substantial.  (See *Bell*, *supra*, 179 Cal.App.4th at p. 435; *Taylor*, *supra*, 119 Cal.App.4th at p. 639.)

That the actual movement of Doe 2 by Flores was ostensibly measured in feet is not determinative.  As the Supreme Court explained (in connection with aggravated kidnapping), in "determining 'whether the movement is merely incidental to the [underlying] crime . . . the jury considers the "scope and nature" of the movement.  [Citation.]  This includes the actual distance a victim is moved.  However, we have observed that there is *no minimum number of feet* a defendant must move a victim in order to satisfy' " this element.  (*Martinez*, *supra*, 20 Cal.4th at p. 233, italics added; see *People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 [explaining that "dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her [citation] or forcibly moving a robbery victim 40 feet within a parking lot into a car [citation] might, under the circumstances, substantially increase the risk of harm to the victim and thus satisfy the asportation requirement" for aggravated kidnapping].)

Flores relies on *People v. Perkins* (2016) 5 Cal.App.5th 454 (*Perkins*) for support that his movement of Doe 2 was insubstantial.  We find *Perkins* both

legally and factually inapposite. *Perkins* involved the enhancements of aggravated kidnapping (§ 667.61, subd. (d)(2)) and kidnapping under the so-called one-strike rule (*id.*, subd. (j)(1), (2)), as opposed to simple kidnapping at issue in the instant case (*id.*, subd. (e)(1)). (*Perkins, supra,* 5 Cal.App.5th at pp. 462-463.)

This distinction is important because subdivision (d)(2) of section 667.61 *requires* a finding that the defendant "kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense[s]" specified in subdivision (c) of section 667.61. However, as noted *ante*, subdivision (e)(1) of section 667.61 (which excludes subdivision (d)(2) from its scope) contains no such express requirement. Instead, it merely requires that the "defendant kidnapped the victim of the present offense in violation of Section 207, 209, or 209.5."

We also find *Perkins* factually distinguishable. Unlike in the instant case in which a reasonable trier of fact could infer that the movement of Doe 2 from the hallway bathroom into Flores's locked bedroom increased the risk of harm to Doe 2 and decreased the risk of detection of the offense charged in count 10, the *Perkins* court found no substantial evidence existed regarding these factors when the defendant first sexually abused his 11-year-old stepdaughter in the bathroom and then ordered her into the bedroom, located a few feet away, and again sexually abused her. (*Perkins, supra,* 5 Cal.App.5th at pp. 459-460, 470.)

Indeed, the court in *Perkins* noted that there was no evidence that the doors to either the bathroom or bedroom were "closed during the incidents" (*Perkins, supra,* 5 Cal.App.5th at p. 470), or that the location in the bathroom where the crimes initially occurred was visible from the living room, where

the victim's eight-year-old sister was sleeping (*ibid.*). In fact, the court in *Perkins* found that when the defendant moved the victim into the bedroom to commit additional sexual offenses, a "person could reasonably conclude [the victim] should have been at less risk" than in the bathroom because also in the bedroom was the defendant's three-week old daughter, who was lying on the bed. (*Id.* at p. 471.) Thus, *Perkins* does not provide meaningful guidance on the asportation issue in this case.

Because there is substantial evidence in the record from which a reasonable trier of fact could find beyond a reasonable doubt that Flores moved Doe 2 a "substantial distance" for purposes of simple kidnapping under section 207, we reject Flores's evidentiary challenge to the asportation element in connection with count 10.

## 2. Asportation Instruction

Flores contends that because an "associated crime" was involved in this case, the court misinstructed the jury in giving CALCRIM No. 1215[23]

---

[23] The court instructed with CALCRIM No. 1215, "Kidnapping (Pen. Code, § 207(a))," in part as follows: "To prove that the defendant is guilty of Kidnapping, the People must prove that: [¶] 1. The defendant took, held, or detained another person by using force or by instilling reasonable fear; [¶] 2. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶] AND [¶] 3. The other person did not consent to the movement. [¶] . . . [¶] *Substantial distance* means more than a slight or trivial distance. In deciding whether the distance was substantial, you *must* consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you *may* also consider other factors such as whether the distance the other person was moved was beyond that merely incident to the commission of Lewd and Lascivious Act by Force or Fear, whether the movement increased the risk of physical or psychological harm, increased the danger of a foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection." (Third italics added.)

45

because that instruction told the jurors they *may* consider various factors including "whether the distance the other person was moved was beyond that merely incidental to the commission of [the offense in count 10]." Instead, Flores contends the jury was *required* to consider this factor and find it was established. For support, Flores relies on *Martinez, supra*, 20 Cal.4th 225 among other authorities.

The Supreme Court in *Martinez* addressed the asportation standard for section 208, which statute prescribes a higher sentence for kidnapping a person under the age of 14.[24] (*Martinez, supra*, 20 Cal.4th at p. 229.) The *Martinez* court concluded that a trier of fact "should consider the totality of the circumstances" and not just "actual distance" in determining asportation for purposes of section 208, which standard it found was the same for simple kidnapping under section 207, subdivision (a) (*Martinez*, at p. 237); that in so holding, *Martinez* overruled previous authorities including its decision in *People v. Caudillo* (1978) 21 Cal.3d 562, which had made the asportation standard for simple kidnapping "exclusively dependent on the distance involved" (*Martinez*, at p. 233); that for simple kidnapping and the enhanced punishment, a trier of fact therefore could consider the " 'scope and nature' of the movement," "the increased risk of harm to the victim," and the

_____

[24] Subdivision (b) of section 208 provides in part: "If the person kidnapped is under 14 years of age at the time of the commission of the crime, the kidnapping is punishable by imprisonment in the state prison for 5, 8, or 11 years."

"diminished likelihood of discovery" (*id.* at p. 236; CALCRIM No. 1203[25]); but that, "[w]hile the jury may consider a victim's increased risk of harm, it may convict of simple kidnapping without finding an increase in harm, or any other contextual factors" if "the victim was moved a distance that was 'substantial in character' " (*Martinez*, at p. 237).

Martinez then added, "in a case involving an associated crime, the jury should be instructed to consider whether the distance a victim was moved was incidental to the commission of that crime in determining the movement's substantiality." (*Martinez*, *supra*, 20 Cal.4th at p. 237, citing *In re Earley* (1975) 14 Cal.3d 122, 129.) Flores relies on this language in

---

[25] CALCRIM No. 1203 provides in part: "The defendant is charged [in Count __] with kidnapping for the purpose of (robbery/rape/spousal rape/oral copulation/sodomy/sexual penetration) [in violation of Penal Code section 209(b)]. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to commit (robbery/ [or] rape/ [or] spousal rape/ [or] oral copulation/ [or] sodomy/ [or] sexual penetration/ [or] *<insert other offense specified in statute>*); [¶] 2. Acting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear; [¶] 3. Using that force or fear, the defendant moved the other person [or made the other person move] a substantial distance; [¶] 4. The other person was moved or made to move a distance beyond that merely incidental to the commission of a (robbery/ [or] rape/ [or] spousal rape/ [or] oral copulation/ [or] sodomy/ [or] sexual penetration/ [or] *<insert other offense specified in statute>*; [¶] 5. When that movement began, the defendant already intended to commit (robbery/ [or] rape/ [or] spousal rape/ [or] oral copulation/ [or] sodomy/ [or] sexual penetration/ [or] *<insert other offense specified in statute>*); [¶] [AND] [¶] 6. The other person did not consent to the movement[.] [¶] . . . [¶] As used here, *substantial distance* means more than a slight or trivial distance. The movement must have increased the risk of [physical or psychological] harm to the person beyond that necessarily present in the (robbery/ [or] rape/ [or] spousal rape/ [or] oral copulation/ [or] sodomy/ [or] sexual penetration/ [or] *<insert other offense specified in statute>*). In deciding whether the movement was sufficient, consider all the circumstances relating to the movement."

*Martinez*, which is also included in paragraph 4 of CALCRIM No. 1203 applicable to aggravated kidnapping, to support his claim of instructional error. We find this contention unavailing.

First, *Martinez* did not hold that when an associated crime is involved in a simple kidnapping, a court must instruct, and the trier of fact must find, that asportation requires that the victim's movement not be merely incidental to the commission of that crime. Instead, *Martinez* held that a jury *must* consider the "totality of the circumstances" in determining the movement's substantiality, and as such, *may* consider other factors including whether the movement was merely incidental to the associated crime. (*Martinez*, *supra*, 20 Cal.4th at p. 237; see CALCRIM No. 1215.)

Second, *Martinez* did not involve a kidnapping enhancement, as does the instant case. Its language regarding an "associated crime" is thus inapplicable here, as the kidnapping in the instant case involved only *one* crime, "Lewd and Lascivious Act by Force or Fear" (count 10), and the accompanying *enhancement*. (See *People v. Superior Court (Grilli)* (1978) 84 Cal.App.3d 506, 512 [noting an enhancement does not define a crime but instead imposes an added penalty when the crime is committed under specified circumstances]; Cal. Rules of Court, rule 4.405(3) [an enhancement is "an additional term of imprisonment added to the base term"].)

Third, even if the court erred in instructing the jury with regard to the asportation requirement, we conclude it was harmless because (as we have found) substantial evidence exists from which a reasonable trier of fact could find beyond a reasonable doubt that Flores moved Doe 2 a "substantial distance" (see *Jackson*, *supra*, 58 Cal.4th at p. 749; CALCRIM No. 1215); and therefore, there is no reasonable probability the jury would have returned a

48

verdict on the kidnapping enhancement more favorable to Flores (see *Watson*, *supra*, 46 Cal.2d at p. 836).[26]

## V. Cumulative Error

Flores contends that, even if the asserted errors individually do not warrant reversal, the cumulative effect of them does. "A predicate to a claim of cumulative error is a finding of error. There can be no cumulative error if the challenged rulings were not erroneous." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)

Moreover, to the "extent there are instances in which we have found error or assumed its existence, we have concluded no prejudice resulted." (*People v. Chism* (2014) 58 Cal.4th 1266, 1309; see *People v. Williams* (2015) 61 Cal.4th 1244, 1291 [rejecting the defendant's claim that "numerous alleged errors, committed during both phases of his trial, cumulatively prejudiced him" because there was either no error "or, in those instances where error has been found or assumed, no prejudice"].)

Because, in the instant case, there was no error or any purported error was deemed harmless, we reject Flores contention that his trial was fundamentally unfair under the cumulative error doctrine. (See *People v. Rivera* (2019) 7 Cal.5th 306, 348 [concluding that, even if the trial court erred in admitting evidence of the defendant's "postcrime statements and conduct," "it was not individually prejudicial" and thus refusing to apply the cumulative error doctrine to reverse the defendant's judgment].)

---

[26] In light of our decision on the merits of this issue, we decline to reach the People's alternate contention that Flores forfeited this purported claim of error by failing to object to the court's instruction of CALCRIM No. 1215.

49

## VI. Correction of Clerical Errors

Finally, Flores contends there are clerical errors in the trial court minutes that should be corrected. The People agree, as do we.

The October 28, 2020 minute order provided the jury returned a true finding on the simple kidnapping enhancement on count 10 (§ 667.61, subd. (e)(1));[27] and also returned a true finding on the multiple victim enhancement on counts 2, 4, 5, 7, 9, 10, and/or 11 (*id*. at subd. (e)(4)).

The court amended nunc pro tunc the October 28 minute order by a separate minute order dated December 17, 2020. The December 17 minute order provided:

> "The Court finds that the minute order dated 10/28/2020 does not correctly/clearly reflect the Court order and orders it corrected Nunc Pro Tunc to reflect:
>
> "ADD:
>
> "Jury Finds Enhancement(s) VA[28] in count 05 True.
>
> "Jury Finds Enhancement(s) VA in count 10 True.
>
> "Jury Finds Enhancement(s) VA in count 11 True.
>
> "STRIKE:
>
> "ENTITLED ACTION; FIND
>
> "THAT THE DEFENDANT; MARTIN FLORES; DURING THE COMMISSION OF COUNTS 2 4 5 7 9 10 AND/OR 11 OF THE INFORMATION; DID COMMIT AN OFFENSE AGAINST MORE THAN ONE VICTIM; WITHIN THE MEANING OF PENAL CODE SECTION 667.61 SUBDIVISION (E) SUBSECTION (4)."

---

27    The minute order did not specifically refer to the kidnapping allegation, but rather provided, "Jury Finds Enhancement(s) TF in count 10 True."

28    Ostensibly, the abbreviation "VA" stands for "victim allegations."

The parties agree the portion of the October 28 minute order that was ordered stricken was consistent with the jury's verdict. Furthermore, they agree there were no multiple victim allegations or other sentencing allegations in counts 5 and 11.

We agree with the parties that the October 28 minutes should be corrected to (1) reinsert the language that was deleted by the December 17 minutes; (2) strike the added language about the "victim allegations" in counts 5, 10, and 11 from the December 17 minutes; and (3) clarify the jury found true "MARTIN FLORES, during the commission of count 10 of the [second amended] information, did commit a KIDNAPPING, within the meaning of Penal Code section 667.61, subdivision (e), subsection (1)."

## DISPOSITION

The trial court is directed to modify its minutes of October 28 and December 17, 2020, as set forth in this opinion. Judgment affirmed.


HALLER, Acting P. J.

WE CONCUR:


O'ROURKE, J.


DO, J.

51